# EXHIBIT A

**REORGANIZATION AND CONTRIBUTION AGREEMENT**

This REORGANIZATION AND CONTRIBUTION AGREEMENT (this "*Agreement*") is made and entered into as of December 10, 2021 (the "*Effective Date*"), by and among the following parties ("Parties"): (a) Lumio HX, Inc., a Delaware corporation ("*Buyer*" or "*Lumio*"); (b) Smart Energy Today, Inc., a Washington corporation (the "*Seller*"); and (c) the Shareholders of the Company set forth on <u>Exhibit A</u> (each, a "*Shareholder*", and collectively, the "*Shareholders*" or the *Company*"). For additional clarity, references to "*Seller*" or "*Sellers*" herein shall include the Shareholders.

**INTRODUCTION**

A.    For purposes of this Agreement, (i) the Company's trademarks, as well as all other registered or unregistered marks and logos, and other intellectual property rights are referred to as the "*Company Proprietary Rights*"; and (ii) the Company is in the business of marketing, designing, selling, financing, installing and maintaining state-of-the-art residential and/or commercial photovoltaic solar systems and storage batteries and related and ancillary products and services (collectively referred to herein as the "*Business.*").

B.    The Parties desire to enter into this Agreement whereby the assets owned and/or held by the Seller and used in connection with the Business are sold, contributed, conveyed, transferred and assigned to the Buyer (all of such sold, contributed, and assigned assets, the "*Assigned Assets*") in exchange for a total purchase price of certain shares of the common stock of Lumio Holdings, Inc. ("*Holdings*" and together with Lumio, "*Lumio*") and an amount of cash as hereinafter defined as the "*Total Purchase Price*").

C.    The Parties have agreed that the Seller has a total of 2,818,500 shares of Holdings common stock comprising the Total Purchase Price (the "*Shares*") at the Closing in consideration therefor and a cash compensation equal to Twenty-Five Thousand Dollars ($25,000.00).

D.    The Parties intend (i) for the transactions contemplated herein to qualify as a reorganization under Internal Revenue Code Section 368(a)(1)(c) and this Agreement and the documents related hereto shall constitute a "plan of reorganization" within the meaning of Treasury Regulations Section 1.368-2(g); and (ii) the Shares received by the Company in exchange for the Assigned Assets, which consist of all or substantially all of the assets of the Company, will be subsequently distributed in liquidation to the Shareholders pursuant to a Plan of Complete Liquidation and Dissolution attached hereto as <u>Exhibit C</u> (the "*Plan of Liquidation*").

**AGREEMENTS**

In consideration of the mutual covenants, agreements and understandings contained herein and intending to be legally bound, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**ARTICLE 1**
**ASSETS AND LIABILITIES**

**1.1    Assigned Assets**.  At Closing, the Seller agrees that it will sell, contribute, convey, and assign to the Buyer, and it shall purchase, receive, and accept from the Seller, all of its rights, title, and

interest, of every kind and nature in and to the Assigned Assets, in each case free and clear of all Liens other than Permitted Liens.

(a)     **Assigned Assets Generally**. For clarity, and other than the Excluded Assets, the Assigned Assets include all of the assets owned or held by the Seller related to the Business, including, without limitation:

(i)     Those certain Material Contracts listed on Disclosure Schedule 1.1(a)(i) (the "*Assigned Material Contracts*").

(ii)     All Company accounts, notes, and other receivables, including any prepayments and prepaid expenses.

(iii)     All Intellectual Property used in the Business, including, without limitation, the Company Proprietary Rights, Owned Software, Licensed Software, manuals, know-how and all other Company Intellectual Property.

(iv)     All inventory and related supplies, owned or licensed, including any inventory that may be in transit or that has been purchased, including, without limitation, that inventory set forth on Disclosure Schedule 1.1(a)(iv).

(v)     All vehicles, equipment and tools, including, without limitation, those set forth on Disclosure Schedule 1.1(a)(v).

(vi)     An amount of cash (the "*Restricted Cash*") equal to the amount of the Company's Liabilities to customers, marketing or advertising, computers or other hardware, purchase orders made but yet to be fully paid, training, fixture upgrades, and or Transaction Expenses ("*Restricted Funds*").

(vii)     All rights to payment, including all accounts receivable, deposits, prepaid expenses and amounts to be received for purchase orders not yet paid related to the Business.

(viii)     All rights existing under those purchase orders to purchase goods or products relating to the Business, including those set forth on Disclosure Schedule 1.1(a)(viii).

(ix)     All rights, causes of action and claims (including with respect to any damages, fees, expenses, credits, refunds, and reimbursements), deposits, prepayments, warranties, guarantees, refunds, causes of action, rights of recovery, rights of set-off, and rights of recoupment of every kind and nature related to the Business.

(x)     All contracts of the Seller relating to the Business, including but not limited to, customer and supplier contracts, and those other contracts set forth on Disclosure Schedule 1.1(a)(x).

(xi)     All Leased Real Property set forth on Disclosure Schedule 1.1(a)(xi) and Leased Personal Property and Equipment set forth on Disclosure Schedule 1.1(a)(xi).

(xii)    All rights under any warranties and indemnification obligations (whether implied or express) received from Company suppliers to the extent pertaining to Assigned Assets.

(xiii)    The right, but not the obligation, to hire any of Company's employees, consultants, and/or independent contractors.

(xiv)    All books and records related to the Business, including copies of all data residing on computers used in the Business (even if such computers are Excluded Assets).

(xv)    All goodwill related to the Business.

(xvi)    To the extent transferable, all permits, licenses, approvals, franchises, and other authorizations obtained from federal, state, or local governmental agencies or other similar agencies, and all data and records pertaining thereto (the "*Permits*").

(xvii)    All telephone numbers, social media sites, web domains, Facebook or Meta pages and Instagram accounts related to the Business.

(xviii)    All rights to receive mail and other communications addressed to the Business.

(xix)    All customer lists (including all electronic mail order and internet customer lists and all sales histories for such customers), price lists, vendor and supplier lists (including purchasing history and documents), and similar items (including both hard copy and electronic versions) related to the Business.

(xx)    All legal claims, demands or actions.

(xxi)    All other assets related to the Business that are not Excluded Assets.

**1.2    Excluded Assets**.  The Assigned Assets do not include the Excluded Assets. "*Excluded Assets*" means only the following assets:

(a)    All bank accounts and all cash and cash equivalents of the Seller above those certain baseline amounts of working capital, as set forth on Schedule 1.2(a).

(b)    All owned real property, and certain office equipment located therein identified on Disclosure Schedule 1.2(b).

(c)    The consideration payable to or for the benefit of the Company pursuant to this Agreement and all of the Company's and Shareholders' other rights under this Agreement and other Ancillary Agreements.

(d)    The Seller's income Tax records, and all rights to receive refunds or credits with respect to Taxes or other governmental charges related to the operation of the Business prior to the Closing Date (provided that the Buyer will have access thereto and may make copies thereof before and after Closing).

(e)     All insurance policies of the Seller and rights to pursue and define claims thereunder (other than to the extent such insurance relates to an Assigned Asset under which the Buyer or its Affiliates is a named insured or is a matter that is subject to indemnification hereunder).

(f)     The corporate record books of the Seller (provided that the Buyer will have reasonable access thereto and may make copies thereof before and after Closing);

(g)     All equity interests in the Company, corporate record book, and the charter documents of Company and its affiliates (and all rights thereunder).

(h)     The assets, properties, and rights specifically set forth on Disclosure Schedule 1.2(h).

**1.3     Liabilities**.

(a)     **Retained Liabilities**.  Except only for the Assumed Liabilities expressly specified in Section 1.3(b), the Buyer will not assume, whether by assignment, express or implied contract, by operation of law or otherwise, or be obligated to pay, perform, discharge or guarantee, any Liabilities of the Seller or its Affiliates, whether arising before, at or after the Closing Date (collectively, the "*Retained Liabilities*").  Without limiting the foregoing, and subject to the exclusion of the Assumed Liabilities, the Retained Liabilities will include all Liabilities of the Seller or its Affiliates which:

(i)     Were incurred or relate to events which occurred on or before the Closing Date, whether or not relating to the Assigned Assets other than obligations arising out of the transactions generating the Restricted Cash.

(ii)     Relate to any Excluded Assets.

(iii)     Relate to any Liability or obligation related to any violation, breach, or default by the Company.

(iv)     Are in respect of Taxes (i) relating to the Business, the Assigned Assets or the Assumed Liabilities for any taxable period ending on or prior to the Closing Date and (ii) owed by the Company or its Affiliates (other than Taxes specifically allocated to the Buyer under Section 7.4).

(v)     Constitute any Liability to the Seller or its Affiliates other than any Assumed Liabilities.

(vi)     Relate to any Debt or are Liabilities incurred by the Seller or its Affiliates in connection with the transactions contemplated by this Agreement.

(vii)     Relate to any of the Seller's employees, including but not limited to, any unfunded obligations under any Employee Benefit Plan.

(viii)     Arise out of or in connection with any violation of or non-compliance of the Company or any of its Affiliates with any Law.

(ix)     All Liabilities incurred by the Seller between the Effective Date and the Closing Date.

(b)     **The Buyer's Limited Assumption of Certain Seller Liabilities**.  From and after the Closing Date, the Buyer or its Subsidiaries will assume only the following specific liabilities and obligations of the Company and no others (the "*Assumed Liabilities*"):

(i)     Liabilities for Restricted Funds but only up to the amount actually offset against the Total Purchase Price otherwise payable under Section 1.1(c).

(ii)     All Liabilities and obligations for Taxes for which the Buyer is specifically liable pursuant to Section 7.4.

(iii)     All other Liabilities, Debts and obligations arising out of or relating to the Buyer's ownership or operation of the Business and the Assigned Assets on or after the Closing Date.

**1.4     Transfer of Title to the Assigned Assets**.  The Seller will sell, assign, transfer, convey, and deliver the Assigned Assets to the Buyer, or its designee, at the Closing Date by means of a bill of sale, title, assignment and assumption agreement and such other endorsements, certificates and instruments of transfer as shall be necessary or appropriate to vest good title to the Assigned Assets in the applicable assignee, free and clear of any Liens other than Permitted Liens. If the Seller is party to a contract related to the Business which has not been disclosed on the Disclosure Schedules attached hereto, the Buyer, at its option, may elect to include such contract as an additional Assigned Asset by written notice to the Seller.

**ARTICLE 2**
**CONSIDERATION**

**2.1     Total Purchase Price**.

(a)     **Total Purchase Price.**  The total purchase price payable by the Buyer for all of the Assigned Assets will be 2,818,500 Shares (the "*Buyer Equity*") and cash in an amount equal to twenty five thousand dollars ($25,000.00) (collectively with the Buyer Equity, the "*Total Purchase Price*"). The Total Purchase Price will be payable to Seller and its Shareholders as set forth on Disclosure Schedule 2.1(a) on the Closing Date. The Buyer Equity comprising part of the Total Purchase Price shall be subject to vesting as set forth in the Stock Restriction Agreement. The Parties agree that the Total Purchase Price has a value equal to the value of the Assigned Assets as of the Closing Date, and that the value is the result of arms-length negotiations.

(b)     **Tax Consequences; Plan of Reorganization; Tax Reporting.** The Parties intend that the purchase of the Assigned Assets contemplated by this Agreement shall qualify as a tax-free reorganization pursuant to Section 368(a)(1)(C) of the Code and that the receipt of all Shares shall qualify as tax free consideration for the Assigned Assets pursuant to Section 361(a) of the Code. The Parties shall file all Tax Returns required by Law consistent with such treatment, except as otherwise required by final determination of a Tax authority. By executing this Agreement, the Parties hereto adopt this Agreement as a "plan of reorganization" within the meaning of Section 1.368-2(g) and 1.368-3(a) of the Treasury Regulations. Notwithstanding the foregoing, the Buyer makes no representations or warranties to the

5

Shareholders regarding the Tax treatment of the transaction contemplated hereby, or any of the Tax consequences to the Company, the Shareholders or other security holders of the Company, under this Agreement or any of the other transactions or agreements contemplated hereby. The Company and the Shareholders acknowledge that each is relying solely on their own Tax advisors in connection with this Agreement and the other transactions and agreements contemplated hereby. Neither the Company, the Shareholders, the Buyer, nor any of their Affiliates, has taken, shall take or agreed to take any action, or shall refrain from taking any action, that would reasonably be expected to prevent the transactions contemplated hereby from constituting a reorganization qualifying under Section 368(a)(1)(C) of the Code.

(c)     **Withholding**. The Buyer shall be entitled to deduct and withhold from any amounts otherwise payable under this Agreement to the Company such amounts as must be legally required to be deducted and withheld with respect to the making of such payment under the Code, or any applicable provision of U.S. federal, state, local or non-U.S. tax law. Such amounts so deducted and withheld shall be treated for all purposes of this Agreement as having been paid to the Company in respect of which such deduction and withholding was made by the Buyer.

**2.2     Additional Provisions Related to Lumio Equity**. At or on the Closing Date, and in connection with the Post-Closing Employment Agreements with Rex Schade ("*Rex*") and Yumi Schade ("*Yumi*") (together, the "*Equity Recipients*"), the Equity Recipients shall enter into stock restriction agreements ("*Stock Restriction Agreements*") with Holdings, which such agreements shall provide that the Shares (the "*Lumio Equity*") shall vest on a monthly basis over a three year period with the vesting commencement date for such vesting period beginning as of the date set forth therein, but provided that the Equity Recipients shall receive twenty five percent (25.00%) vesting credit effective as of the Closing Date.

**ARTICLE 3**
**CLOSING**

**3.1     Closing**.  Although the Parties intend to execute and deliver this Agreement as soon as practicable (the "*Effective Date*"), the Closing Date of the transactions contemplated by this Agreement (the "*Closing*") shall take place at the offices of the Buyer, Lehi, Utah, or such other place, or by remote communication, as agreed to by the Parties, commencing at 10:00 a.m. Mountain Daylight Time on the next Business Day following the satisfaction or waiver of all conditions of the Parties to consummate the transactions contemplated hereby (other than conditions with respect to actions the respective Parties will take at the Closing itself) as evidenced by written notice by the Buyer specifying such date or such other date as the Parties may mutually determine (the "*Closing Date*"). The Parties have targeted that the Closing Date will occur by December 10, 2021 (the "*Target Date*") provided that Lumio may extend the Target Date by twenty one (21) days upon notice to Seller. All transactions contemplated herein to occur on and as of the Closing Date shall be deemed to have occurred simultaneously and to be effective as of the close of business on such date. The Closing may also take place by exchange of PDFs or other electronic means.

**3.2**    **Deliverables**.

(a)    **By the Company**.  At the Closing, the Seller will deliver or cause to be delivered the following, duly executed as applicable by the authorized Company officer:

(i)    Documents of assignment and conveyance for assignment of the Assigned Assets, as reasonably requested by the Buyer, including a bill of sale (the "*Bill of Sale*") and an assignment and assumption agreement (the "*Assignment and Assumption Agreement*").

(ii)    A signature page or joinder agreement to the Buyer Shareholders Agreement, Bylaws, and any other internal governance documents, as reasonably required by the Buyer.

(iii)    All payoff and release letters in form and substance satisfactory to the Buyer with respect to the complete payment and satisfaction of all of the Seller's Debts and Liens related to the Assigned Assets, if any.

(iv)    Evidence that the transactions contemplated by this Agreement have been duly authorized by applicable corporate or limited liability company action of the Seller and its Affiliates.

(v)    All Required Consents, if any, to the transactions contemplated by this Agreement.

(vi)    All governmental and local filings, authorizations, permits and/or approvals that are required or desirable for the consummation of the transactions contemplated by this Agreement and to operate the Business.

(vii)    All other consents, certificates, documents, instruments and other items required to be delivered by the Company or its Affiliates pursuant to this Agreement, and all such other documents, certificates and instruments as the Buyer may reasonably request in order to give effect to the transactions contemplated by this Agreement.

(viii)    All assignments and instruments of transfer of Company Intellectual Property.

(ix)    Employment Agreements entered into between the Buyer and Company's Founders on or before the Closing Date (the "*Employment Agreements*").

(x)    A certificate of good standing or other similar evidence from the State of Washington with respect to the Company as of a date not more than ten (10) days prior to the Closing Date.

(xi)    All instruments and documents necessary or desirable to release any and all Encumbrances on the Purchased Assets, other than Permitted Liens, including appropriate copies of the appropriate as-filed UCC financing statements in respect of the release of the Liens listed on Section 3.2(a)(xii) of the Disclosure Schedules.

(xii)    A Seller executed statement described in Treas. Reg. Section 1.1445-2(b)(2) certifying that the Company is not a foreign person for the purposes of Code Section 1445, duly executed by the Company.

(xiii)    A Secretary's Certificate, attached hereto as <u>Exhibit D</u>, in form and substance satisfactory to Buyer, certifying that all representations in this Agreement and the Exhibits and Disclosure Schedules attached hereto are true, correct, and complete representations, as of the Effective Date.

(xiv)    The Stock Restriction Agreements.

(b)    **By the Buyer**.  At the Closing, the Buyer will deliver or cause to be delivered the following, duly executed as applicable by the Buyer:

(i)    If applicable, countersignature to the <u>Bill of Sale</u> and the <u>Assignment and Assumption Agreement</u>.

(ii)    Evidence that the transactions contemplated by this Agreement have been duly authorized by applicable corporate action of the Buyer.

(iii)    All other consents, certificates, documents, instruments and other items required to be delivered by the Buyer pursuant to this Agreement.

(iv)    The Employment Agreements.

(v)    The Total Purchase Price.

(vi)    Such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to the Sellers, as may be required to give effect to the Transaction Documents.

**3.3    Conditions to Closing**.

(a)    **For the Seller**.  The obligations of the Seller and its Affiliates to consummate the transaction are subject to satisfaction or waiver of the followings conditions on or at the Closing Date:

(i)    All of the representations and warranties of the Buyer in <u>Article 4</u> must have been accurate in all material respects as of the Effective Date and must be accurate in all material respects as if made at or on the Closing Date.

(ii)    The Buyer shall have performed and complied in all material respects with all of the covenants and agreements in this Agreement to be performed by it to or at the Closing Date.

(iii)    The Buyer shall have delivered the deliverables required to be delivered at the Closing Date pursuant to <u>Section 3.2(b)</u>.

(iv)      All other consents, certificates, documents, instruments and other items required to be delivered by the Buyer pursuant to this Agreement.

(b)      **For the Buyer**.  The obligations of the Buyer to consummate the transaction are subject to satisfaction or waiver of the followings conditions on or at the Closing Date:

(i)      All of the representations and warranties of the Company in <u>Article 4</u> must have been accurate in all material respects as of the date of the Effective Date and must be accurate in all material respects as of the Closing Date.

(ii)      The Seller and its Affiliates shall have performed and complied in all material respects with all of the covenants and agreements in this Agreement to be performed by them prior to or at the Closing Date.

(iii)      The Seller shall have delivered the deliverables required to be delivered at the Closing Date pursuant to <u>Section 3.2(a)</u>.

(iv)      There shall not have been a Material Adverse Change in the Business of the Company or any significant Affiliate as of the Closing Date.

(v)      This Agreement and the Plan of Liquidation shall have been adopted and approved by the Shareholders and the Company's Board of Directors.

(vi)      The financing with White Oak Global Advisors, LLC ("*White Oak*") and Fiera Comox Private Credit Opportunities Open-End Fund, LP ("*Fiera Comox*") shall have been received by the Buyer.

(vii)      The following entities shall have executed and delivered to the Buyer Asset Purchase Agreements in form and substance substantially similar to this Agreement: Lift Energy Construction, Inc. ("*Lift*"), Atlantic Key Energy, LLC ("*AKE*"), Zenith Security, LLC ("*Zenith Security*") and Zenith Solar, LLC ("*Zenith Solar*") (collectively referred to as the "*Seller Group of Companies*")

(viii)      The Buyer shall have satisfactorily completed the due diligence investigation of the Seller and its Affiliates.

(ix)      All other consents, certificates, documents, instruments and other items required to be delivered by the Buyer pursuant to this Agreement.

**3.4      Termination**.

(a)      **Events**.  The respective obligations of the Parties to consummate the Closing may be terminated and abandoned at any time at or before the Closing only as set forth below. Nothing contained in this Section shall be construed as a release or waiver by any Party hereto of any of its rights against any other Party arising out of any breach of this Agreement by the other Party.

(i)      By and at the option of the Buyer or the Seller if the Closing shall not have occurred by the Target Date.

(ii)    At any time, without liability of any Party to the others, upon the mutual written consent of the Buyer and the Company.

(iii)    By the Buyer or the Company, if any condition set forth above applicable to such Party shall become incapable of being satisfied by the date set forth in Section 3.4(a)(i) and is not waived; provided, that such termination right shall not be available to such Party if it has not used its commercially reasonable efforts to cause such condition to be satisfied.

(b)    **Effect of Termination**. In the event of the termination of this Agreement pursuant to Section 3.4(a), all obligations of the Parties hereunder (except under this Section and under Article 8) and all representations and warranties shall terminate without any Liability of any Party to any other Party, and all expenses incurred by any Party hereto shall be for its own account, except that nothing herein shall relieve any Party from any Liability with respect to breaches on or prior to such date of termination by any Party of covenants or agreements contained herein. In addition, in the event of the termination of this Agreement pursuant to Section 3.4(a)(a)(i) or (ii), then, in such event, the Company shall reimburse the Buyer for an amount equal to the Buyer's Transaction Expenses.  In addition, in the event of a termination of this Agreement pursuant to Section 3.4(a)(ii), then, in such event, the Buyer shall reimburse Seller for an amount equal to Seller's Transaction Expenses.

**ARTICLE 4**
**COMPANY REPRESENTATIONS AND WARRANTIES**

The Seller and its Shareholders jointly and severally, represent and warrant to Lumio that the statements contained in this Article 4 are true, correct and complete as of the date of the Effective Date of this Agreement and will be true, correct and complete as of the Effective Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Article 4), except as set forth in the corresponding section of the Disclosure Schedule. For purposes of this Article 4, the "*Company's Knowledge*," "*Knowledge of the Company*" and similar phrases shall mean the actual knowledge of Rex Schade, Yumi Schade, and Jonathan Gibbs, (collectively, the "*Company's Founders*").

**4.1    Organization and Enforceability.**

(a)    **Formation**.  The Company is an entity duly organized under the laws of the State of Washington. The Company is duly authorized to conduct its business and is in good standing under the Laws of each jurisdiction where such qualification is required, except where the failure to be so duly qualified and in good standing would not result in a Material Adverse Effect.  The Company has full entity power and authority and all Permits necessary to carry on the businesses in which it is engaged and to own, lease and use the properties owned, leased and used by it.  The Company is not default under or in violation of any provision of their Organizational Documents. The Company has no subsidiaries.

(b)    **Authorization**.  The Company has full power, authority and legal capacity to execute and deliver the Agreement and the Ancillary Agreements to which it is a Party and to perform its obligations hereunder and thereunder.  The execution and delivery by the Company of this Agreement and the Ancillary Agreements and the performance by it of the transactions

contemplated hereby and thereby have been duly approved by all requisite organizational actions of the Company.

(c)    **Binding**.  Assuming the due authorization, execution and delivery by the Buyer, this Agreement constitutes the valid and legally binding obligation of the Seller, enforceable against the Seller  in accordance with the terms of this Agreement, subject to the Enforceability Exceptions.  Upon the execution and delivery by the Seller of each Ancillary Agreement to which it is a Party (and assuming due authorization, execution and deliver by the Buyer), such Ancillary Agreement will constitute the valid and legally binding obligation of the Company, enforceable against it in accordance with the terms of such Ancillary Agreement, subject to the Enforceability Exceptions.

(d)    **Capitalization**.  Disclosure Schedule 4.1(d) sets forth the ownership of the Company.

(e)    **Non-contravention; Required Consents**.  Except for the Consents identified on Disclosure Schedule 4.1(e) (the "*Required Consents*"), neither the execution and the delivery of this Agreement nor the Ancillary Agreements to which either the Company or its affiliates is a Party, nor the consummation of the transactions contemplated hereby or thereby, will (i) violate or conflict with any Law or Order to which the Company is subject, (ii) violate or conflict with any provision of the Organizational Documents of the Company, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice or payment under any Contract, Permit, instrument, or other arrangement to which the Company is a Party or by which it is bound or to which any of its assets is subject (or result in the imposition of any Lien upon any of its assets), except in the case of each of the foregoing clauses (i) and (iii) for such violations, conflicts, breaches and defaults that would not have a Material Adverse Effect on the Company.  Except as set forth on Disclosure Schedule 4.1(e) and notices, filings, Consents or Permits that, if not obtained or made, would not have a Material Adverse Effect on the Company, the Company is not required to give any notice to, make any filing with, or obtain any Consent or Permit of any Governmental Body or other Person in order to consummate the transactions contemplated by this Agreement or the Ancillary Agreements to which the Company is a party.

(f)    **Brokers' Fees**.  The Seller has no Liability to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement.

**4.2    Title**.  The Company and its Affiliates have good and marketable title to, or a valid leasehold interest or license in the Assigned Assets, free and clear of all Liens other than Permitted Liens. The Company will assign the Assigned Assets at the Closing to the Buyer or its Affiliates free and clear of all Liens other than Permitted Liens.  The Assigned Assets constitute all of the assets used in, or necessary to operate, the Business.

**4.3**     **Intellectual Property**.

(a)     **Registered Intellectual Property**. Disclosure Schedule 4.3(a) sets forth a list of all Registered Intellectual Property and Owned Software owned by the Company and all Licensed Software licensed by the Company. None of the Licensed Software is owned by any Affiliates of the Company.  The Company is the sole and exclusive owners of all of the Registered Intellectual Property. All of the Registered Intellectual Property is valid and enforceable and, to the Knowledge of the Company, none of the Registered Intellectual Property is being misappropriated, violated or infringed by any third party in any material manner.

(b)     **Company Intellectual Property**.  The Company either owns or, as necessary, has sufficient and enforceable rights to use all Intellectual Property used in the conduct of the Business as currently conducted (the "*Company Intellectual Property*"). No claims are pending or, to the Knowledge of the Company, threatened, (i) challenging the ownership, enforceability, scope, validity, or use by the Company of any Company Intellectual Property owned by the Company, or (ii) alleging that the Company is violating, misappropriating or infringing the rights of any Person with regard to any Intellectual Property.

(c)     **Infringement**.   The operation of the Business as currently conducted or contemplated to be conducted does not violate, misappropriate or infringe the Intellectual Property of any other Person. To the Knowledge of the Company, no Person is infringing the rights of the Company with respect to any Intellectual Property owned by the Company.

(d)     **Confidential Information**.  The Company has taken commercially reasonable steps to maintain and preserve the Company Intellectual Property, including to preserve the confidentiality of any confidential information of the Company.

(e)     **Data**.  The Company maintains and follows policies and procedures regarding data security, privacy, data transfer and the use of data that are commercially reasonable to protect privacy and data and ensure that the Company is in compliance with all applicable Laws applicable thereto. To the Knowledge of the Company, since the Effective Date, there have been no material: (i) losses or thefts of data or security breaches relating to data used in the Business; (ii) violations of any security policy regarding any such data; (iii) unauthorized access or unauthorized use of any such data; and (iv) unintended or improper disclosure of any personally identifiable information in the possession, custody or control of the Company, or a contractor or agent acting on behalf of the Company.

(f)     **Software**.  Disclosure Schedule 4.3(f) sets forth a list of all Owned Software owned by the Company and all Licensed Software licensed by the Company. None of the Licensed Software is owned by any Affiliates of the Company. The Company possesses or controls: (i) the source code, object code and (as available) documentation for all Owned Software; and (ii) to the extent necessary as applicable in the Business, object code or source code and (available) documentation, or have other business arrangements in place, to develop, support, and maintain, material Licensed Software. No person other than the Company has any ownership right or similar interest in or with respect to the Owned Software. The Company has disclosed source code to Owned Software only pursuant to written confidentiality terms that reasonably protect the Company's rights in such Owned Software. To the Knowledge of the Company, no Owned

Software is subject to any obligation that would require the Company to divulge to any person any source code or trade secret that is part of any Owned Software.

**4.4    Financials**.

(a)    **Financial Statements**.  The Company has provided to the Buyer correct and complete copies of the following financial statements of the Company: (a) the reviewed consolidated balance sheets and related consolidated statements of income, changes in stockholders' and members' equity and cash flows of December 31, 2020; and (b) the unreviewed balance sheets and statements of income as of and for the ten (10) month period ended October 31, 2021 (the "*Interim Balance Sheet Date*"). Such financial statements are correct and complete, are consistent with the books and records of the Company (which are in turn correct and complete), have been prepared in accordance with GAAP consistently applied, and present fairly in all material respects the financial condition, results of operation of the Company as of and for their respective dates and for the periods then ending; provided, however, that the interim financial statements are subject to normal, recurring year-end adjustments and lack notes (none of which will be material individually or in the aggregate).

(b)    **Undisclosed Liabilities**. The Company does not have any Liabilities of the type required by GAAP to be reflected on a balance sheet except for (a) Liabilities reflected on the Company's most recent financial statements referenced in Section 4.4(a) or incurred subsequent thereto in the Ordinary Course of Business, or (c) result from the obligations of the Company under this Agreement or the Ancillary Agreements.

(c)    **Changes**.  Since the Interim Balance Sheet Date, the Business has been conducted in the Ordinary Course of Business, and there has not been any Material Adverse Change and no event has occurred which could reasonably be expected to result in a Material Adverse Change.

**4.5    Legal Compliance**.  The Company is in compliance in all material respects with, all applicable Laws, and no Proceeding has been filed or commenced or, to the Knowledge of the Company, threatened in writing alleging any failure so to comply.  The Company has all Permits required to operate the Business. Since the Effective Date, the Company and its Affiliates have not received any written notice or communication alleging any non-compliance of any of the foregoing. Neither the Company, nor, to the Knowledge of the Company, anyone acting on its behalf, has made or offered any Illegal Payments.

**4.6    Tax Matters**. The Company has filed with the appropriate taxing authorities all Tax Returns that they were required to file. All such Tax Returns are correct and complete in all material respects.  All Taxes due and owing by the Company as reflected on the Tax Returns has been paid.  There are no Liens for Taxes (other than Taxes not yet due and payable) upon any of the assets of the Company. No deficiency or proposed adjustment for any amount of Tax has been proposed, asserted or assessed by any taxing authority against the Company that has not been paid, settled or otherwise resolved.  There is no Proceeding or audit now pending, proposed or, to the Knowledge of the Company, threatened against the Company with respect to any Taxes, and no such Proceeding or audit has occurred since the Effective Date.  All Taxes that are required to be withheld or collected by the Company has been duly withheld and collected and, to the extent required, have been properly paid or deposited as required by applicable Laws. Since the date of their formation, the Company has been, and through the Closing Date will be, entities that are qualified to be treated as either a partnership, S corporation or an entity disregarded as separate from its owner for federal (and, where applicable, state and local) income Tax purposes.

**4.7     Real Property**.  Except as specifically set forth in <u>Disclosure Schedule 4.7</u>, any and all owned or leased real property are Excluded Assets.

**4.8     Material Contracts**.

(a)     **Material Contracts**.  <u>Disclosure Schedule 4.8(a)</u> lists all Material Contracts to which the Company is a Party. The Company has provided the Buyer with correct and complete copies of each Material Contract.

(b)     **Binding**.  Each Material Contract is a valid and binding agreement of the Company, and is in full force and effect, is enforceable against the Company, subject to the Enforceability Exceptions, and, to the Knowledge of the Company is valid, binding and enforceable against the third party thereto, subject to the Enforceability Exceptions, and is not subject to any claim of, or right to, termination or rescission by any third party thereto, and each case will so continue on identical terms after the Closing Date in accordance with its terms.  No Material Contract has been breached by the Company or, to the Knowledge of the Company, any third party thereto.  The Company has performed all obligations under each Material Contract required to be performed by the Company prior to the date hereof.  There is no event which, upon giving of notice or lapse of time or both, would constitute a breach or default by the Company or, to the Knowledge of the Company, any third party thereto or would permit the rescission, termination or modification of any Material Contract. The Company has not assigned any of its rights, titles or interests under any Material Contract.

**4.9     Insurance**.  <u>Disclosure Schedule 4.9</u> sets forth all insurance coverages applicable to the Company or the Business. There is no claim pending by or against the Company under any such policies as to which coverage has been questioned, denied or disputed.  All premiums payable under all such policies and bonds have been paid.

**4.10    Litigation**.  Except as set forth on <u>Disclosure Schedule 4.10</u>, there are no and have been no Proceedings involving the Company since the Effective Date, nor has the Company received written notice of a claim or dispute that is reasonably likely to result in any Proceeding.  There is no outstanding Order of any Governmental Body to which the Company is subject.

**4.11    Employees and Employee Benefits**.

(a)     **Employees**.  <u>Disclosure Schedule 4.11(a)</u> sets forth a complete list of all employees of or independent contractors of the Company, along with the job title, location, classification (i.e., exempt or not exempt), status (e.g., part-time, full-time, seasonal or temporary), and the hourly or salary rate of compensation of each such employee or independent contractor in 2020 and any changes thereto since 2020, and any noncompetition restrictions, if any, applicable to such employees.  None of the Company's employees is a party to or otherwise bound by any collective bargaining agreement, contract or other agreement or understanding with a labor union or labor organization. None of the Company's employees or independent contractors are subject to a written employment, consulting or independent contractor agreement.   None of the Company's employees or independent contractors would be contractually restricted from being employed by the Buyer or its Affiliates.  The Company is and has been since the Effective Date in compliance in all material respects with all Laws applicable to employment and work authorization in the United States.  Each person providing services to the

Company as employees or as independent contractors have been properly classified in all material respects for all purposes under the Code and ERISA and have been properly classified in all material respects as either exempt or nonexempt under applicable Law.

(b)    **Employee Benefits**.  Disclosure Schedule 4.11(b) lists each Employee Benefit Plan that the Company maintains or to which the Company contributes or has any obligation to contribute or with respect to which the Company and its Subsidiaries have any liabilities.  Each such Employee Benefit Plan (and each related trust, insurance Contract, or fund) has been maintained, funded and administered in accordance with the terms of such Employee Benefit Plan and complies in form and in operation in all material respects with the applicable requirements of ERISA, the Code, and other applicable Laws.  All contributions (including all employer contributions and employee salary reduction contributions) that are due have been made within the time periods prescribed by applicable Law.

**4.12    Debt**.  Except as set forth on Disclosure Schedule 4.12, the Company does not have any Debt and other Liability and are not liable for any Debt or Liability of any other Person.  No event of default exists under any Contracts with respect to Debt or Liability.

**4.13    Investment Experience**.  The Seller hereby acknowledges and represents that (i) the Company has prior investment experience, including investment in non-listed and unregistered securities, and that the Company has employed the services of an investment advisor, attorney and/or accountant to read all of the documents furnished or made available by the Buyer to evaluate the merits and risks of such an investment on Seller's behalf; (ii) the Seller recognizes the highly speculative nature of an investment in the Shares; and (iii) the Seller is able to bear the economic risk and illiquidity which the Seller assumes by investing in the Shares. The Seller has had the opportunity to retain, and to the extent necessary Seller has retained, at its own expense, and relied upon the advice of appropriate professionals, including an investment advisor, attorney and/or accountant regarding the investment, tax and legal merits and consequences of this Agreement and its acquisition of the Shares hereunder.

**4.14    No SEC Review**.  The Seller hereby acknowledges that this transaction has not been reviewed by the SEC because this transaction is intended to be exempt from the registration requirements of Section 5 of the Securities Act pursuant to Section 4(2) thereof and Regulation D promulgated under said act. The Seller further acknowledges that no federal or state agency or authority has made any finding or determination as to the accuracy or adequacy of this Agreement or as to the fairness of the terms of this transaction or any recommendation or endorsement of the Shares. Any representation to the contrary is a criminal offense. In making an investment decision, the Seller must rely on its own examination of the Buyer and the terms of this transaction, including the merits and risks involved.

**4.15    Purchase For Own Account**.  The Shares to be acquired by the Seller hereunder will be acquired for investment for the Seller's own account, not as a nominee or agent, and not with a view to the public resale or distribution thereof within the meaning of the Securities Act, and the Company has no present intention of selling, granting any participation in, or otherwise distributing the same the Seller also represents that the Seller has not been formed for the specific purpose of acquiring the Shares.

**4.16    Rule 144**.  The Seller acknowledges that the Shares must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available. The Seller is aware of the provisions of Rule 144 promulgated under the Securities Act, which permits limited resale of shares purchased in a private placement subject to the satisfaction of certain conditions,

including, among other things, the existence of a public market for such Shares, the availability of certain current public information about the company that issued such shares, the resale occurring following the period of time prescribed by Rule 144, the sale being effected through a "broker's transaction" and the number of shares being sold during any three-month period not exceeding specified limitations.

**4.17    Legend**.  The Seller consents to the placement of a legend on any certificate or other document evidencing the Shares indicating that such Shares have not been registered under the Securities Act or any state securities or "blue sky" laws and setting forth or referring to the restrictions on transferability and sale thereof contained in this Agreement. The Seller is aware that the Buyer will make a notation in its appropriate records and issue "stop transfer" instructions to its transfer agent with respect to the restrictions on the transferability of such Shares.

**4.18    Registration of Shares**.  The Seller understands and hereby acknowledges that the Buyer is under no obligation to register the Shares under the Securities Act. The Seller consents that the Buyer may, if it desires, permit the transfer of the Shares out of the Seller's name only when the Seller's request for transfer is accompanied by an opinion of counsel reasonably satisfactory to the Buyer that neither the sale nor the proposed transfer results in a violation of the Securities Act or any applicable state "blue sky" laws.

**4.19    No Public Offering**.  The Seller hereby acknowledge that the sale and issuance of the Shares hereunder has not been (a) accompanied by the publication of any advertisement not (b) effected by or through a broker-dealer in a public offering.

**4.20    Environmental Matters**.  The Seller has complied since the Effective Date, and is in compliance, in each case in all material respects, with all Environmental Requirements, and has no Liabilities thereunder.

**4.21    Affiliate Transactions**.  Except as identified on <u>Disclosure Schedule 4.21</u>, the Company does not, nor its family members and its Affiliates (other than the Company): (a) own, directly or indirectly, any stock or other ownership interest or investment in any Person that is a competitor, supplier, customer, franchisee, lessor or lessee of the Company; (b) have any claim against or owe any amount to, or are owed any amount by, the Company; (c) have any interest in or own any assets, properties or rights used in the conduct of the Business; (d) are a Party to any Contract to which the Company is a Party or which otherwise benefits the Business; or (e) have received from or furnished to the Company any goods or services (including services as an employee), or is otherwise involved in any business relationship with the Company.

**4.22    Inventory**. All of the inventory and related supplies of Company, all inventory in transit that has been purchased, including but not limited those items identified as Inventory on the Company's financing statements ("*Inventory*"), whether located at the premises of the Company or elsewhere, are of a quantity and quality usable and saleable in the ordinary course of business, are not damaged or defective and are merchantable. All of the Inventory consists of bona fide assets.  All of the Inventory, whether located at the premises of the Company or elsewhere, are properly reflected on the Company's books and records and are not the subject of any counterclaim, or a claim for a charge-back, deduction, credit, set-off or other offset, or any claim of a party-in-possession, such as a claim for a Lien or other restriction. All of the Inventory, whether located at the premises of the Company or elsewhere, are in compliance with all applicable laws, including those pertaining to labeling and packaging.

**4.23    Sufficiency of Assets**. The Assigned Assets include all of the assets necessary to permit the Buyer to conduct the Business after the Closing in a manner substantially equivalent to the manner as it is being conducted immediately prior to the Closing Date.  Except for the Excluded Assets, no officer, director, employee or shareholder of the Company own any asset or property used in or pertaining to the Business.

**4.24    Restrictions on Business Activities**. There is no Contract, Order, or other instrument binding upon the Company, or its officers or directors which restricts or prohibits any of them from competing with any other Person, from engaging in any business or from conducting activities in any geographic area, or which otherwise restricts or prohibits the conduct of the business of the Company and its Affiliates.

**4.25    Disclaimer of Other Representations and Warranties**. Neither the Company, the Shareholders and their respectful Affiliates, representatives nor advisors have made, or shall be deemed to have made, to the Buyer any representation or warranty, express or implied, in connection with the transactions contemplated by this Agreement, including with respect to the Assigned Assets, other than those expressly made by the Company in this Article 4 and any written warranties which by their express terms are stated to be warranties and representations, if any, made by them in the Ancillary Agreements and Certificates at Closing, and any such other representations or warranties are hereby disclaimed.

**4.26    Disclosure**.  The representations and warranties in this Article 4, the Company's financial statements and the Disclosure Schedules, taken as a whole, do not contain any untrue statement of a material fact, and do not knowingly fail to state a material fact necessary in order to make the statements therein or herein, in light of the circumstances they were made, not misleading.

**4.27    No Other Representations and Warranties**.   The representations and warranties contained in Article 4 hereof, the Disclosure Schedules, the other agreements contemplated by this Agreement to which any the Company is a party, and in any certificate delivered by the Company at Closing pursuant hereto or thereto are the only representations and warranties made by the Company in connection with the contemplated transactions set forth herein and all other representations and warranties are hereby disclaimed.

### ARTICLE 5
### THE BUYER REPRESENTATIONS AND WARRANTIES

The Buyer represents and warrants to the Company that the statements contained in this Article 5 are correct and complete as of the Effective Date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Article 5), except as set forth in the corresponding section of the Disclosure Schedule.

**5.1    Formation**. The Buyer is a corporation duly organized under the laws of the State of Delaware.  The Buyer is duly authorized to conduct its business and is in good standing under the Laws of each jurisdiction where such qualification is required. The Buyer has full entity power and authority and all Permits necessary to carry on the businesses in which it is engaged and to own, lease and use the properties owned, leased and used by it. The Buyer is not in default under or in violation of any provision of its Organizational Documents.

**5.2     Authorization**. The Buyer has full power, authority and legal capacity to execute and deliver the Agreement and the Ancillary Agreements to which it is a party and to perform its obligations hereunder and thereunder.  The execution and delivery by the Buyer of the Agreement and the Ancillary Agreements to which it is a Party and the performance by the Buyer of the transactions contemplated hereby and thereby have been duly approved by all requisite organizational actions of the Buyer.

**5.3     Capitalization**. The authorized capital stock of Holdings consists of 50,000,000 shares of common stock, par value $0.00001 per share. All shares of capital stock of Holdings outstanding as of the date of this Agreement have been duly authorized and validly issued, are fully paid, and nonassessable.

**5.4     Status of Shares**.  The Shares, when issued and allotted at the Closing, will be duly authorized, validly issued, fully paid, nonassessable, and free of any preemptive rights, will be issued in compliance with all applicable laws concerning the issuance of securities, and will have the rights, preferences, privileges, and restrictions set forth in Holdings' Organizational Documents, and will be free and clear of any Liens of any kind and duly registered in the name of the Company, in Holdings' stockholders ledger.

**5.5     Intentionally Deleted**.

**5.6     Non-contravention**. Neither the execution and the delivery of this Agreement nor the Ancillary Agreements to which the Buyer is a party, nor the consummation of the transactions contemplated hereby or thereby, will (a) violate or conflict with any Law or Order to which the Buyer is subject, (b) violate or conflict with any provision of the Organizational Documents of the Buyer, or (c) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any Party the right to accelerate, terminate, modify, or cancel, or require any notice or payment under any Contract, Permit, instrument, or other arrangement to which the Buyer is a party or by which it is bound or to which any of its assets is subject (or result in the imposition of any Lien upon any of its assets).  The Buyer is not required to give any notice to, make any filing with, or obtain any Consent or Permit of any Governmental Body or other Person in order to consummate the transactions contemplated by this Agreement or the Ancillary Agreements to which the Buyer is a Party.

**5.7     Brokers' Fees**. The Buyer has no Liability to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement.

**5.8     Valid Issuance of Securities**. The Shares, when issued and sold in accordance with the terms of this Agreement, will be duly and validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under this Agreement, the Stock Restriction Agreement, the Shareholders Agreement among Holdings' shareholders and/or bylaws and applicable state and federal securities laws.

**5.9     Disclaimer of Other Representations and Warranties**.  Neither the Buyer, its Affiliates, representatives nor advisors have made, or shall be deemed to have made, to the Company any representation or warranty, express or implied, in connection with the transactions contemplated by this Agreement, including with respect to the Buyer Equity, other than those expressly made by the Buyer in this Article 5 and any written warranties which by their express terms are stated to be warranties and representations, if any, made by them in the Ancillary Agreements, and any such other representations or warranties are hereby disclaimed. For clarity, any representation and warranty as to the value of the Shares is hereby disclaimed.

**5.10    No Reliance.** The Buyer has not relied on any representations, warranties, or other statements of any Person other than the representations and warranties set forth in <u>Article 4</u> of this Agreement, the Disclosure Schedules, the other agreements contemplated by this Agreement to which the Company is a party, and in any certificate delivered by the Company at Closing pursuant hereto or thereto.

**ARTICLE 6**
**INDEMNIFICATION**

**6.1    Survival and Time Limitations.** All representations, warranties, covenants and agreements of the Parties in this Agreement or any other certificate or document delivered pursuant to this Agreement will survive for a period of twenty four (24) months following the Closing Date. The right to indemnification, payment of any losses or other remedy based on such representations, warranties, covenants, and obligations will not be affected by any investigation conducted with respect to, or any knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing Date, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant or obligation.  If the Closing occurs (a) the Company will have no liability with respect to any claim under <u>Section 6.2</u> unless the Buyer notifies the Company of such a claim on or before twelve (12) months after the Closing Date; provided, however, that any claim relating to any Fundamental Reps may be made at any time without limitation up to the applicable statute of limitation period, and (b) the Buyer will have no liability with respect to any claim under <u>Section 6.3</u> unless the Company notifies the Buyer of such a claim on or before twelve (12) months after the Closing Date; provided, however, that any claim relating to any Fundamental Reps may be made at any time without limitation.  If the Company or the Buyer, as applicable, provide proper notice of a claim within the applicable time period set forth above, if any, then liability for such claim will continue until such claim is resolved.

**6.2    Indemnification by the Company.**  Subject to the terms and conditions of this <u>Article 6</u>, the Seller and Seller's Shareholders will indemnify and hold harmless the Buyer and its Subsidiaries and its officers, managers and directors (the "*Buyer Indemnified Parties*") from and against the entirety of any Adverse Consequences that the Buyer Indemnified Party may suffer or incur (including any Adverse Consequences they may suffer or incur after the end of any applicable survival period, provided that an indemnification claim with respect to such Adverse Consequence is made pursuant to this Article prior to the end of any applicable survival period) resulting from, arising out of, relating to, in the nature of, or caused by (a) any breach or inaccuracy of any representation or warranty made by the Company in <u>Article 4</u> of this Agreement or in any Ancillary Agreement, (b) any breach of any covenant or agreement of the Company in this Agreement or in any Ancillary Agreement, and (c) the Retained Liabilities.

**6.3    Indemnification by the Buyer**.  Subject to the terms and conditions of this <u>Article 6</u>, the Buyer will indemnify and hold harmless the Company and its officers, managers and directors (the "*Company Indemnified Parties*") from and against the entirety of any Adverse Consequences they may suffer or incur (including any Adverse Consequences they may suffer or incur after the end of any applicable survival period, provided that an indemnification claim with respect to such Adverse Consequence is made pursuant to this Article prior to the end of any applicable survival period) resulting from, arising out of, relating to, in the nature of, or caused by (a) any breach or inaccuracy of any representation or warranty made by the Buyer in <u>Article 5</u> of this Agreement or in any Ancillary Agreement, (b) any breach of any covenant or agreement of the Buyer in this Agreement or in any Ancillary Agreement, and (c) the Assumed Liabilities.

**6.4**     **Limitations on Indemnification**.

(a)     **Basket**. With respect to the indemnification under Section 6.2(a) or Section 6.3(a) with respect to breaches of representations, warranties, and covenants, an Indemnifying Party will have no liability with respect to such matters until the Indemnified Party has suffered aggregate Adverse Consequences by reason of all such breaches in excess of $100,000 (the "*Threshold Amount*") , after which point the Indemnifying Party will be obligated to indemnify the Indemnified Party from and against all Adverse Consequences above the Threshold Amount.

(b)     **Cap**. With respect to the indemnification under Section 6.2(a) or Section 6.3(a) with respect to breaches of representations and warranties (excluding the Fundamental Reps), the aggregate maximum liability of an Indemnifying Party shall be equal to $4,000,000.

(c)     **Aggregate Cap**. Except as otherwise provided herein, the aggregate maximum liability for which Seller shall be liable under Section 6.2(a) with respect to the Fundamental Reps shall be an amount equal to the Total Purchase Price, with the price per share relative to the Shares calculated as of the Closing Date.

(d)     **Exceptions**. The foregoing limitations shall not apply in respect of any Adverse Consequences arising out of, resulting from or relating to (i) fraud or intentional misconduct by any Indemnifying Party, or  (ii) a breach by Sellers of Sections 4, 6.5, or 6.6 of that certain Agreement Regarding Confidentiality, Non Competition, and Assignment of Inventions by and between the Company and Employee dated and effective as of the Closing Date (the "*Confidentiality Agreement*"), and which forms a material part of the Employment Agreements, and/or Sections 7.7 or 7.10 of this Agreement. No Party shall be entitled to indemnification for a breach of representation or warranty under Sections 6.2(a) and 6.3(a) that such a party had Knowledge prior to the Closing Date.

**6.5**     **Third-Party Claims**.

(a)     **Notice**. If a third Party initiates a claim, demand, dispute, lawsuit or arbitration (a "*Third-Party Claim*") against an Indemnified Party with respect to any matter that the Indemnified Party might make a claim for indemnification against any Indemnifying Party under this Article, then the Indemnified Party must promptly notify the Indemnifying Party in writing of the existence of such Third-Party Claim and must deliver copies of any documents served on the Indemnified Party with respect to the Third-Party Claim; provided, however, that any failure on the part of an Indemnified Party to so notify an Indemnifying Party shall not limit any of the obligations of the Indemnifying Party under this Article except to the extent such failure actually prejudices the defense of such proceeding, it being understood and agreed that the failure of the Indemnified Party to so notify the Indemnifying Party prior to settling a Third-Party Claim (whether by paying a claim or executing a binding settlement agreement with respect thereto) or the entry of a judgment or issuance of an award with respect to a Third Party-Claim shall constitute actual prejudice to the Indemnifying Party's ability to defend against such Third-Party Claim.

(b)     **Defense by Indemnifying Party**.  Upon receipt of the notice described in Section 6.5(a), the Indemnifying Party will have the right to defend the Indemnified Party against the Third-Party Claim with counsel reasonably satisfactory to the Indemnified Party, provided,

that (i) the Indemnifying Party notifies the Indemnified Party in writing within thirty (30) calendar days after the Indemnified Party has given notice of the Third-Party Claim that the Indemnifying Party will indemnify the Indemnified Party from and against the entirety of any Adverse Consequences the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third-Party Claim, (ii) the Third-Party Claim involves only money damages and does not seek an injunction or other equitable relief or is asserted by any Governmental Authority and (iii) the Indemnifying Party conducts the defense of the Third-Party Claim in a manner that would be considered by a reasonable person to be active and diligent. The Indemnifying Party will keep the Indemnified Party apprised of all material developments, including settlement offers, with respect to the Third-Party Claim and permit the Indemnified Party to participate in the defense of the Third-Party Claim. So long as the Indemnifying Party is conducting the defense of the Third-Party Claim in accordance with Section 6.5(b), the Indemnifying Party will not be responsible for any attorneys' fees or other expenses incurred by the Indemnified Party regarding the Third-Party Claim, unless there is an actual or potential conflict of interest presented by one counsel representing both the Indemnified Party and the Indemnifying Party.

(c)     **Defense by Indemnified Party**. In the event that any of the conditions under Section 6.5(b) is or becomes unsatisfied, however, (i) the Indemnified Party may defend against, and consent to the entry of any judgment on or enter into any settlement with respect to, the Third-Party Claim in any manner it may reasonably deem appropriate, (ii) the Indemnifying Parties will reimburse the Indemnified Party promptly and periodically for the costs of defending against the Third-Party Claim (including reasonable attorneys' fees and expenses), and (iii) the Indemnifying Parties will remain responsible for any Adverse Consequences the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third-Party Claim to the fullest extent provided in this Article 6.

(d)     **Cooperation**. The Party not controlling the defense of a Third-Party Claim shall cooperate with and make available to the controlling Party such assistance and materials as may be reasonably requested by it (including copies of any summons, complaint or other pleading which may have been served on such Party and any written claim, demand, invoice, billing or other document evidencing or asserting the same). The Party controlling such Third-Party Claim shall keep the non-controlling Party reasonably advised of the status of such Third-Party Claim

(e)     **Settlement**. Neither the Indemnified Party nor the Indemnifying Party will consent to the entry of any judgment or enter into any settlement with respect to the Third-Party Claim without the prior written consent of the other Party, which consent will not be unreasonably withheld or delayed.

**6.6     Direct Claims**.

(a)     An Indemnified Party shall make any claims for indemnification pursuant to Section 6.2 or Section 6.3 by delivering an Officer's Certificate to the Indemnifying Party. For purposes hereof, "*Officer's Certificate*" shall mean a certificate signed by an officer of the Buyer, in the case of a Buyer Indemnified Party, or an authorized officer of the Company, in the case of a Company Indemnified Party, which may be amended from time to time by reasonable advance written notice to the Indemnifying Party; and such certificate shall (i) state that the Party claiming indemnification has paid, suffered, sustained or incurred an Adverse Consequence; and (ii) specify

in reasonable detail the individual items of Adverse Consequences included in the amount so stated, the date each such item was paid, suffered, sustained or incurred, or the basis for such anticipated liability.

(b)    The Indemnifying Party may make a written objection ("*Objection*") to any claim for indemnification.  The Objection shall be delivered to the Indemnified Party within fifteen (15) calendar days after delivery of the Officer's Certificate to the Indemnifying Party.  If no Objection is delivered by the Indemnifying Party to the Indemnified Party within such thirty (30) calendar day time period, then the claim made by the Indemnified Party in the Officer's Certificate shall be conclusively deemed to be a liability of the Indemnifying Party and the Indemnifying Party will be obligated to make payment therefor according to the terms of this Article 6.

(c)    The Indemnifying Party and the Indemnified Party shall attempt in good faith to resolve any claim for indemnification to which an Objection is made.  If such Parties are able to resolve any such claim for indemnification, they shall prepare and sign a memorandum setting forth such agreement.  If such Parties are unable to resolve such claim for indemnification, then the Parties shall submit such dispute to binding arbitration in accordance with the provisions of Section 6.6(d).  The Indemnifying Party shall pay to the applicable Indemnified Party by wire transfer of immediately available funds to an account designated by such Indemnified Party fifty percent (50%) of the agreed upon amount of the Adverse Consequences (if any) within five (5) business days of the date of the written memorandum described in the preceding sentence or the final decision of an arbitration panel as set forth in Section 6.6(d), as applicable; provided that (i) if the Buyer is the Indemnifying Party, then amount of the agreed-upon Adverse Consequences (if any) shall be paid to the Company in cash or by a promissory note payable over a twenty-four (24) month period, at the option of the Buyer, and (ii) if the Company is the Indemnifying Party, the amount of the agreed-upon Adverse Consequences (if any) shall be paid to the Buyer or, if applicable, deducted from the unpaid Total Purchase Price, at the option of the Company, in each case, following the date of the written memorandum described above or the final decision of an arbitration panel as set forth in Section 6.6(d).

(d)    In the event of a dispute with respect to claim for indemnification to which an Objection is made that cannot be resolved by the Parties in good faith within ten (10) business days or such longer period as mutually agreed to by the Parties (the "*Arbitration Commencement Date*"), then the Parties shall submit the dispute to binding arbitration in accordance with the applicable rules of the American Arbitration Association or such other rules and procedures as the Parties to the dispute may hereafter consent to in writing.  Judgment upon any arbitration award may be entered into in any court having jurisdiction. Any Party to this Agreement may bring an action, including a summary or expedited proceeding, to compel arbitration of any controversy or claim under this Section 6.6 in any court having jurisdiction over such action.  The arbitration will be conducted in Salt Lake City, Utah, and administered in accordance the with applicable rules of the American Arbitration Association.   The arbitration panel shall consist of one arbitrator appointed by mutual agreement of the Parties, or in the event of failure to agree within ten (10) Business Days following the Arbitration Commencement Date, the Buyer, on the one hand, and the Company, on the other hand, shall each appoint an arbitrator and the two (2) arbitrators so appointed shall promptly thereafter appoint a third arbitrator, provided that if either Party fails to select an arbitrator as set forth herein within twenty (20) days from Arbitration Commencement Date, then the matter shall be resolved by the arbitrator selected by the other Party.  The arbitrator(s) shall so conduct the arbitration that a final result, determination, finding,

judgment and/or award in writing is made or rendered as soon as practicable, but in no event later than thirty (30) Business Days after appointment of the arbitration panel, subject to any reasonable delay due to unforeseen circumstances.  The arbitration award shall be given in writing, shall provide reasons for the decision, shall be signed by the single arbitrator or a majority of the arbitrators, as the case may be, appointed hereunder, shall be final and binding on the Parties, shall not subject to any appeal, and shall deal with the question of costs of the arbitration and all related matters.  Each Party will bear its own costs and expenses of arbitration; provided, however, that, notwithstanding anything to the contrary in this Section 6.6, the arbitrators shall have the authority to award fees and other costs of the arbitration as determined by the single arbitrator or by a majority of the arbitrators, as the case may be.  Notwithstanding the above, any Party may seek equitable relief permitted by this Agreement from any court of competent jurisdiction.

**6.7    Other Indemnification Matters**.

(a)    **Adjustments**.  All indemnification payments under this Article will be deemed adjustments to the consideration payable under this Agreement.

(b)    **Insurance**.  The amount of any Adverse Consequences will be computed net of any insurance proceeds actually received by the Indemnified Party in connection therewith, less the costs of any such recovery, including increases in premiums as a result of such recovery (but not increases in premiums attributable to general increases in prices by the insurer), collection expenses and deductibles and other Adverse Consequences incurred by such Indemnified Party as a result of such claim.

(c)    **Materiality**.  For purposes of determining the amount of Adverse Consequences resulting therefrom, all qualifications or exceptions in any representation or warranty relating to or referring to the terms "material", "materiality", "in all material respects", "Material Adverse Effect" or any similar term or phrase shall be disregarded.

(d)    **No Consequential Damages**.  NOTWITHSTANDING ANYTHING TO THE CONTRARY ELSEWHERE IN THIS AGREEMENT OR PROVIDED FOR UNDER ANY APPLICABLE LAW, IN NO EVENT SHALL ANY INDEMNIFYING PARTY BE LIABLE TO ANY INDEMNIFIED PARTY FOR ANY PUNITIVE, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES, INCLUDING LOSS OF FUTURE REVENUE OR INCOME, DIMINUTION IN VALUE, LOSS OF BUSINESS REPUTATION OR OPPORTUNITY RELATING TO THE BREACH OR ALLEGED BREACH OF THIS AGREEMENT, OR DIMINUTION OF VALUE OR ANY DAMAGES BASED ON ANY TYPE OF MULTIPLE; PROVIDED, HOWEVER, THAT NOTHING HEREIN SHALL PREVENT ANY THE BUYER INDEMNIFIED PARTY OR COMPANY INDEMNIFIED PARTY FROM BEING INDEMNIFIED PURSUANT TO THIS Article 6 FOR ALL COMPONENTS OF AWARDS AGAINST THEM IN THIRD PARTY CLAIMS FOR WHICH INDEMNIFICATION IS PROVIDED PURSUANT TO THIS Article 6.

(e)    **Exclusive Remedy**.  Other than any rights that a Party may have for non-monetary equitable relief, the provisions of this Article 6 are the exclusive remedy of the Parties for a breach of this Agreement.

**6.8    Offset**.  After following the procedures set forth in Section 6.5, Section 6.6 or any other applicable procedure in this Agreement, the Buyer and its Affiliates, upon prior written notice to the

Company, will be entitled, but not obligated, to recover any amounts due from the Company under this Agreement by setting off such amounts against any amounts otherwise payable to Seller or Seller's Shareholders by the Buyer, or, at Buyer's option, shares of Lumio Equity at the price per Share calculated as of the Closing Date; provided that if the Company disputes the amount of any set off, the disputed amount will be placed in escrow with an independent third party pending the resolution of such dispute. Neither the exercise nor the failure to exercise such right of offset will constitute an election of remedies or limit the Buyer in any manner in the enforcement of any other remedies that may be available to them.

### ARTICLE 7
### CERTAIN ADDITIONAL AGREEMENTS

**7.1    Operation of the Business Prior to the Closing Date**. From the date hereof until the Closing Date, Company agrees that the Business will be conducted solely in the Ordinary Course of Business.  Without limiting the generality of the foregoing, the Company will not execute any Material Agreements or incur any significate Debt without the Buyer's prior written consent, which consent shall not be unreasonably withheld.

**7.2    Access and Information**. Prior to Closing, the Company and the Buyer agree to provide the other with reasonable access at reasonable times to the books, records, financial statements, employees of the other, and to reasonably respond to the reasonable requests for information, in connection with their due diligence investigation of the consummation of the transactions contemplated hereby.  The Buyer will keep the information obtained pursuant to this Section 7.2 confidential, and shall cause its directors, officers, employees, representatives and advisors who receive any portion thereof to keep all such information confidential, except as may otherwise be required by Law

**7.3    Notification of Certain Matters**. Prior to Closing, the Company or the Buyer, as applicable, will give the other prompt written notice of (a) any knowledge of or discovery by the notifying Party of the inaccuracy of any representation or warranty by the notifying Party contained in this Agreement or any material failure of the notifying Party to comply with or satisfy any covenant or agreement to be complied with or satisfied by such Party hereunder (and each Party shall use commercially reasonable efforts to remedy such failure), and (b) the receipt of any notice or other communication from any Governmental Body or any third Party that would be reasonably expected to cause the notifying Party to fail to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by such Party under this Agreement; provided that the delivery of any notice pursuant to this Section shall not limit or otherwise affect the remedies available hereunder to the Party receiving such notice.

**7.4    Certain Post-Closing Matters.** The Company agrees to pay or perform when due the Retained Liabilities.   The Buyer agrees to pay or perform when due the Assumed Liabilities.  All Transfer Taxes and Bulk Sales Act obligations will shared equally by the Buyer and the Company.  The Buyer or its Affiliates may, but are not required to, make an offer of any employment to any individual who is or was employed by the Company, and if any such employee is hired by the Buyer or their Affiliates, such employee will be released from any noncompetition or confidentiality obligations owed to the Company or its Affiliates. At or after Closing, the Company agrees to obtain "tail" insurance coverage for the Business for a period of up to one (1) year and on other terms reasonably satisfactory to the Buyer.  If after the Closing Date, Company or its Affiliates receive any monies belonging to the Buyer or its Affiliates (including with respect to any Assigned Assets), Company will pay or cause their Affiliates to promptly pay such monies over to the Buyer, and if the Buyer or its Subsidiaries receives any monies belonging to the

Company or their Affiliates (including with respect to any Excluded Assets), the Buyer will pay or cause its Subsidiaries to promptly pay such monies over to the Company.

**7.5    Further Assurances**.  Both before and after Closing, each of the Parties to this Agreement, at the reasonable request of another Party hereto, will execute and deliver such other instruments and do and perform such other acts and things as may be reasonably necessary or desirable for effecting the consummation of this Agreement and the transactions contemplated hereby.   The Company acknowledges and agrees that from and after the Closing, the Buyer and its Affiliates will be entitled to possession to copies of all documents, books, records (including Tax records), agreements and financial data relating to the Business, and the Company agrees to preserve all such information for at least six years and will provide reasonable access to (with a right to copy) such information to the Buyer and its Affiliates.

**7.6    Confidentiality**.  At Closing, the mutual confidentiality agreement executed by the Buyer and Company will terminate.   After Closing, Company agrees not to disclose or use any Confidential Information, except that if and as long as the Company is providing services to the Buyer or its Affiliates, the Company may use the Confidential Information in the ordinary course of providing such services on behalf of the Buyer or its Affiliates so long as such use is in compliance with all policies and agreements applicable to the Company. "*Confidential Information*" means any information concerning the business and affairs of the Buyer or its Affiliates, except information that is (a) already generally available to the public; or (b) lawfully acquired by the Company, or its directors, officers, employees or agents from and after the Closing from sources that are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation.  If the Company or their respective directors, officers, employees or agents are compelled to disclose any Confidential Information by judicial or administrative process or by other requirements of Law, the Company shall promptly notify the Buyer in writing so that the Buyer may seek a protective order or other appropriate remedy, at the Buyer's sole expense.  The Company will cooperate with the Buyer in any attempt by the Buyer to obtain any such protective order or other remedy.

**7.7    Covenant Not to Compete**.   From and after the Closing, the Seller and its affiliates covenants and agrees as follows:

With respect to Rex and Yumi only:

(a)    **Restricted Period and Restricted Area**. "*Restricted Period*" means the period commencing on the Closing Date and continuing until that date which is the four-year anniversary of the Closing Date. "*Restricted Area*" means the geographic boundaries of the United States of America.

(b)    **Noncompetition**.  During the Restricted Period and except on behalf of the Buyer and its Affiliates, the Company and its Affiliates will not, directly or indirectly, in any manner (whether on the Company's own account, or as an owner, operator, manager, consultant, officer, director, employee, investor, agent or otherwise), anywhere in the Restricted Area, engage directly or indirectly in the Business or any business that competes with the Business, or own any interest in, manage, control, participate in (whether as an owner, operator, manager, consultant, officer, director, employee, investor, agent, representative or otherwise), or consult with or render services for any Person that is engaged in the Business or in any activity that competes directly or indirectly with the Business; provided, however, that no owner of less than 1% of the

outstanding stock of any publicly traded corporation shall be deemed to engage solely by reason thereof in its business.

(c)     **Nonsolicit**.  During the Restricted Period, the Company and its affiliates will not, directly or indirectly, in any manner (whether on his own account, as an owner, operator, manager, consultant, officer, director, employee, investor, agent or otherwise), (a) call upon, solicit or provide services to any Person that is or was affiliated with the Company in any way with the intent of selling or attempting to sell services related to the Business, (b) hire or engage or recruit, solicit or otherwise attempt to employ or engage or enter into any business relationship with any Person employed by the Buyer or any of its Subsidiaries, or induce or attempt to induce any Person to leave such employment, or (c) in any way interfere with the relationship between the Buyer or its Subsidiaries and any employee, vendor or other Person with a current, former or prospective business relationship with the Buyer or its Subsidiaries (including, without limitation, by making any negative or disparaging statements or communications regarding the Buyer, any of its Subsidiaries or any of their operations, officers, directors or investors); provided, however, that this shall not preclude (i) the use by the Company or any of its Affiliates of a general solicitation (such as a newspaper advertisement or on internet, radio or television) not specifically directed to any Person employed by the Buyer or any of its Subsidiaries or any Person that is or was a franchisee of the Company or of the Buyer or its Subsidiaries or (ii) hiring any former employee or franchisee of the Buyer, its Subsidiaries or the Company, whose employment or contract with the Buyer, its Subsidiaries or the Company was terminated, so long as, for the avoidance of doubt, such former employee or franchisee is hired or contracted to work in a business that is unrelated to the Business.

(d)     **Enforcement**.  If the final judgment of a court of competent jurisdiction declares that any term or provision of this Section 7.7 is invalid or unenforceable, the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closer to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.  The Restricted Period shall be tolled, and therefore extended, during any period of non-compliance by the Company. In the event of litigation involving this Section, the non-prevailing Party shall reimburse the prevailing Party for all costs and expenses, including reasonable attorneys' fees and expenses, incurred in connection with any such litigation, including any appeal therefrom.  The existence of any claim or cause of action by the Company, whether predicated on this Agreement or otherwise, will not constitute a defense to the enforcement by the Buyer of the provisions of this Section.

(e)     **Injunctive Relief**.  The Company hereby agrees that in the event of breach of this Section 7.7, damages would be difficult, if not impossible, to ascertain, that irreparable damage would occur in the event that any of the provisions of this Section 7.7 were not performed in accordance with their specific terms or were otherwise breached, and that the character, periods and geographical area and the scope of the restrictions on the Company's activities in this Section 7.7 are fair and reasonably required for the protection of the Buyer and its Affiliates.  It is accordingly agreed that, in addition to and without limiting any other remedy or right they may have, the Buyer will be entitled to seek an injunction or other equitable relief in any court of competent jurisdiction, without any necessity of proving damages or any requirement for the

26

posting of a bond or other security, enjoining any such breach of this <u>Section 7.7</u>, and enforcing specifically the terms and provisions.  The Company hereby waives any and all defenses it may have on the ground of lack of jurisdiction or competence of the court to grant such an injunction or other equitable relief.

With respect to Jonathan Gibbs only:

Those provisions with are contained within that certain Separation Agreement by and between Lumio, Inc and Mr. Gibbs, dated September 13, 2021, a copy of which is attached hereto as <u>Exhibit E</u>.

**7.8    Continuing Assistance**. Subsequent to the Closing, the Parties shall, at their own cost, assist each other (including making records available) in the preparation of their respective Tax Returns and the filing and execution of Tax elections, if required, as well as any audits or litigation that ensue as a result of the filing thereof, to the extent that such assistance is reasonably requested

**7.9    Termination of Competing Identities**. Immediately following the Closing, but in no event later than thirty (30) days from the Closing Date, the Company shall take all such steps as may be necessary to effect the following:

(a)    either: (i) change the corporate or company names of all the Company so that none of such Person's corporate or company name includes any reference to Smart Energy Today, Inc or any similar identifications or (ii) dissolve the Company or any affiliated entities that include any reference to Smart Energy Today, Inc. or any similar identifications in such Person's corporate or company name; and

(b)    terminate or transfer to the Buyer (at the Buyer's discretion) all d/b/a, t/a or other fictitious name filings held by the Company or its Affiliates that include any reference to Smart Energy Today, Inc. or any similar identifications.

**7.10    Allocation of Total Purchase Price Only to Certain Shareholders**.  The Seller (and specifically the Shareholders) hereby covenant and expressly agree that the entirety of the Total Purchase Price shall be allocated solely among Rex and Yumi on an equal, pro rata basis. For clarity, Seller and the Shareholders hereby covenant and expressly agree that none of the Shares and no portion of the Total Purchase Price shall be given, allocated, or transferred to Jonathan Gibbs or any Person for or on behalf of Jonathan Gibbs for any reason. For further clarity, Seller and the Shareholders covenant and expressly agree that in the event any Person, including Seller and/or the Shareholders, shall purport to give, allocate, or transfer any of the Shares to Jonathan Gibbs, then, in such event, such Shares purportedly so given, allocated, or transferred shall immediately and automatically be cancelled and forfeited by such Person and/or Mr. Gibbs.

**7.11    Vesting of Shares.** Rex and Yumi hereby covenant and expressly agree that at any time, in the event any of them shall breach the provisions of: (a) <u>Sections 4, 6,5, or 6.6</u> of that certain Confidentiality Agreement, or (b) <u>Sections 7.7 or 7.10</u> then, in such event, at the time of such breach, all Shares held by the breaching Shareholder, whether such Shares shall be vested shares or unvested shares, shall immediately and automatically be deemed unvested shares and thereafter cancelled and forfeited by such breaching Shareholder.

**ARTICLE 8**
**GENERAL**

     **8.1**    **Press Releases and Public Announcements**. No Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior written approval of the Buyer; provided, however, that any Party may make any public disclosure it believes in good faith is required by applicable Law (in which case the disclosing Party will use its reasonable best efforts to advise the other Parties prior to making the disclosure). Notwithstanding the foregoing, after the Closing, the Buyer shall be permitted to issue press releases, make public announcements and communicate with employees and franchisees without the consent or participation of Company.

     **8.2**    **Conflict Waiver and Attorney-Client Privilege.** Each of the Parties hereto acknowledges and agrees, on its own behalf and on behalf of its directors, members, shareholders, partners, officers, employees and Affiliates, that: (i) Dentons Durham Jones Pinegar P.C. ("_Buyer Counsel_") has acted as counsel only to Buyer in connection with this Agreement and the transactions contemplated herein and for no other party, including the Parties. Each of the Parties agrees that following the execution of this Agreement, such representation and any prior representation of the Parties herein shall not any preclude Buyer Counsel from serving as counsel to Buyer or any director, member, shareholder, partner, officer or employee of any Party herein, in connection with any litigation, claim, obligation, or other matter arising out of or relating to this Agreement or the transactions contemplated by this Agreement; and (ii) Seller shall not seek to have Buyer Counsel disqualified from any such representation for any reason. Each of the Parties hereto hereby consents thereto and waives any conflict of interest arising in connection with this Agreement, and each of such Parties shall cause any of its Affiliates to consent to waive any conflict of interest arising from this Agreement. Each of the Parties acknowledges that such consent and waiver is voluntary, that it has been carefully considered, and that the Parties have consulted with counsel or have been advised they should do so in connection herewith. The covenants, consent, and waiver contained in this Section 8.2 shall not be deemed exclusive of any other rights to which Buyer Counsel is entitled whether pursuant to law, contract, or otherwise.

     **8.3**    **No Third-Party Beneficiaries**. This Agreement shall not confer any rights or remedies upon any Person other than the Parties, and their respective successors and permitted assigns.

     **8.4**    **Entire Agreement**. This Agreement (including the documents referred to herein) constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

     **8.5**    **Succession and Assignment**. This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the Buyer.

     **8.6**    **Counterparts**. This Agreement may be executed in one or more counterparts (including by means of facsimile or portable document format (PDF)), each of which shall be deemed an original but all of which together will constitute one and the same instrument.

     **8.7**    **Headings**. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**8.8** **Notices**.  All notices, requests, demands, claims, and other communications hereunder will be in writing.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient, (b) when sent by electronic mail or facsimile, on the date of transmission to such recipient, (c) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (d) four Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

|  |  |
|---|---|
| If to the Company: | Smart Energy Today, Inc<br>Attention: Rex Schade, Yumi Schade, Jonathan Gibbs<br>2500 Mottman Road SW<br>Tumwater, WA  98512 |
| With Copy to (*which such copy shall not constitute notice*): | Glaser Weil Fink Howard Avchen & Shapiro, LLP<br>Attn: Jeffery Soza<br>520 Newport Center Drive, Suite 420<br>Newport Beach, CA 92660<br>jsoza@glaserweil.com |
| If to the Buyer: | Lumio HX, Inc.<br>Attention: Greg Butterfield<br>1550 Digital Drive, Ste 500<br>Lehi, Utah 84043 |
| With Copy to (*which such copy shall not constitute notice*): | Lumio HX, Inc.<br>Attention: Travis Marc Wilson, GC and CLO<br>1550 Digital Drive, Ste 500<br>Lehi, Utah 84043<br>travis@lumio.com |
| With Copy to (*which such copy shall not constitute notice*): | Dentons<br>Attention: Travis Marc Wilson, Esq<br>111 South Main Street, Suite 2400<br>Salt Lake City, Utah 84111<br>travis.m.wilson@dentons.com |

Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

**8.9** **Governing Law; Jurisdiction**.  This Agreement shall be governed by and construed in accordance with the domestic Laws of the State of Delaware without giving effect to any choice or conflict of Law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware. Each of the Parties submits to the jurisdiction of the State of Utah and the Federal District Court for the District of Utah in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceeding shall be heard and determined in any such court. Each Party also agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court. Nothing in this Section,

however, shall affect the right of any Party to serve legal process in any other manner permitted by law or at equity. Each Party agrees that a final judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law or at equity.

      **8.10**    **Amendments and Waivers**.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Parties. No waiver by any Party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

      **8.11**    **Severability**.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

      **8.12**    **Expenses.**  Except or otherwise specifically set forth herein, each Party will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

      **8.13**    **Construction**.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.  Any reference to any Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  The word "including" shall mean including without limitation.

      **8.14**    **Disclosure Schedules**.   The Disclosure Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.  Nothing in the Disclosure Schedules hereto shall be deemed adequate to disclose an exception to a representation or warranty made herein unless the Disclosure Schedule identifies the exception with reasonable particularity and describes the relevant facts in reasonable detail.  Without limiting the generality of the foregoing, the mere listing (or inclusion of a copy) of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein (unless the representation or warranty has to do with the existence of the document or other item itself).  The Parties intend that each representation, warranty, and covenant contained herein shall have independent significance.  If any Party has breached any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, or covenant.

      **8.15**    **Waiver of Jury Trial**.  EACH OF THE PARTIES WAIVES THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OR RELATED TO THIS AGREEMENT IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR ANY AFFILIATE OF ANY OTHER SUCH PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS OR OTHERWISE.  THE PARTIES AGREE THAT ANY SUCH

CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY.  WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR ANY PROVISION HEREOF.   THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.

[*REMAINDER INTENTIONALLY LEFT BLANK; SIGNATURES FOLLOW ON NEXT PAGE*]

IN WITNESS WHEREOF, the Parties hereto have executed this Asset Purchase and Contribution Agreement as of the date first above written.

**Lumio HX, Inc.,** a Delaware corporation

By: Greg Butterfield
Its: CEO

**Smart Energy Today, Inc.,** a Washington corporation

By:   Rex Schade
Its:   CEO

**SHAREHOLDERS:**

Name: Rex Schade

Name: Yumi Schade

Name:  Jonathan Gibbs

[Signature Page to Reorganization and Contribution Agreement]

IN WITNESS WHEREOF, the Parties hereto have executed this Asset Purchase and Contribution Agreement as of the date first above written.

**Lumio HX, Inc.,** a Delaware corporation

_____

By: Greg Butterfield
Its: CEO

**Smart Energy Today, Inc.,** a Washington corporation

_____

By:   Rex  Schade
Its:   CEO

**SHAREHOLDERS:**

_____

Name: Rex Schade

_____

Name: Yumi Schade

_____
Name:  Jonathan Gibbs

[Signature Page to Reorganization and Contribution Agreement]

## DEFINITIONS

**Definitions**.  For purposes of this Agreement, the following defined terms have the following meanings:

"*Arbitration Commencement Date*" is defined in <u>Section 6.6.(d)</u>.

"*Adverse Consequences*" means all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, orders, dues, penalties, fines, costs, amounts paid in settlement, liabilities, obligations, Taxes, Liens, losses, damages, deficiencies, costs of investigation, court costs, and other expenses (including interest, penalties and reasonable attorneys' fees and expenses, whether in connection with Third Party Claims or claims among the Parties related to the enforcement of the provisions of this Agreement). Notwithstanding the foregoing, Adverse Consequences shall not include incidental, consequential or punitive damages, lost profits or diminution in value.

"*Affiliate*" of any Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person.  For purposes of this definition, "control" of a Person means the power to, directly or indirectly, direct or cause the direction of the management and policies of such Person whether through ownership of voting securities or other ownership interests, by Contract or otherwise.  In the case of an individual, Affiliate includes the family members of such an individual.  The Company will not be deemed Affiliates of the Buyer for purpose of this Agreement.

"*Agreement*" is defined in the preamble.

"*AKE*" means Atlantic Key Energy, LLC and is defined in <u>Section 3.3</u>.

"*Ancillary Agreements*" means all of the agreements and certificates being executed and delivered pursuant to this Agreement, including the Employment Agreements.

"*Arbitration Commencement Date*" is defined in <u>Section 6.6(d)</u>.

"*Assigned Assets*" is defined in the Introduction.

"*Assigned Material Contracts*" is defined in <u>Section 1.1(a)</u>.

"*Assumed Liabilities*" is defined in <u>Section 1.31.3(b)</u>.

"*Assignment and Assumption Agreement*" is defined in <u>Section 3.2(a)</u>.

"*Bill of Sale*" is defined in <u>Section 3.2(a)</u>.

"*Business Day*" means any day that is not a Saturday, Sunday or any other day on which banks are required or authorized by Law to be closed in Utah.

"*Business*" is defined in the Introduction.

"*Buyer*" is defined in the Preamble.

"*Buyer Equity*" is defined in Section 2.1 (b).

"*Buyer Indemnified Parties*" is defined in Section 6.2.

"*Closing*" or "*Closing Date*" shall mean when all of the conditions in Section 3.3 are either satisfied or waived.

"*Closing*" means the closing date.

"*Company*" is defined in the Introduction.

"*Company Founder*" is defined in the introductory paragraph of Section 4.

"*Company Intellectual Property*" is defined in Section 4.3(b).

"*Company's Knowledge*" is defined in Article 4.

"*Company Proprietary Rights*" is defined in the Introduction.

"*Confidential Information*" is defined in Section 7.6.

"*Consent*" means, with respect to any Person, any consent, approval, authorization, permission or waiver of, or registration, declaration or other action or filing with or exemption by such Person.

"*Contract*" means any written or oral contract, lease, license, indenture, undertaking or other agreement, in each case, that is legally binding.

"*Debt*" means any (a) obligations relating to indebtedness for borrowed money, (b) obligations evidenced by bonds, notes, debentures or similar instruments, (c) obligations in respect of capitalized leases (calculated in accordance with GAAP), (d) obligations in respect of banker's acceptances, performance bonds or letters of credit, (e) obligations for the deferred purchase price of property or services (other than current accounts payable to suppliers and similar accrued liabilities incurred in the Ordinary Course of Business, paid in a manner consistent with industry practice), (f) other long term or non-ordinary course liabilities**,** (g) indebtedness or obligations of the types referred to in the preceding clauses (a) through (f) of any other Person secured by any Lien on any assets of a Person, (h) obligations in the nature of guarantees of obligations of the type described in clauses (a) through (f) above of any other Person, (i) obligations in respect of interest under any existing interest rate swap or hedge agreement entered into by a Person, and (j) any obligation for amounts owed to any Person under any noncompetition, severance, change of control, retention, stay put or similar arrangement, whether triggered prior to or at the Closing, in each case together with all accrued interest thereon and any applicable prepayment, breakage or other premiums, fees or penalties.

"*Effective Date*" is defined in the Preamble.

"*Employee Benefit Plan*" means any (a) qualified or nonqualified employee pension benefit plan or deferred compensation or retirement plan or arrangement, employee welfare benefit plan, or other employee benefit plan (as such terms are defined in ERISA), or (b) equity-based plan or arrangement

(including any stock option, stock purchase, stock ownership, stock appreciation or restricted stock plan) or other retirement, severance, termination, retention, change of control, bonus, profit-sharing or incentive or other plan or arrangement of any kind, whether written or unwritten.

"*Employment Agreements*" is defined in Section 3.2(x).

"*Enforceability Exceptions*" means enforceable except as limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar Laws relating to creditors' rights generally

"*Environmental Requirements*" shall mean all Laws concerning public health and safety, worker and occupational health and safety, natural resources and pollution or protection of the environment, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control, or cleanup of any hazardous substances, materials, or wastes, chemical substances, or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, fuel oil products and byproducts, mold, asbestos, polychlorinated biphenyls, noise, or radiation.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended, and any applicable rules and regulations thereunder, and any successor to such statute, rules or regulations.

"*Excluded Assets*" is defined in Section 1.2.

"*Fiera Comox*" is defined in Section 3.3(b).

"*Fundamental Reps*" means the representations and warranties made (a) by the Company in Sections 4.1 through 4.6 and 4.20, and (b) by the Buyer in Sections 5.1 through 5.6.

"*GAAP*" means generally accepted accounting principles in effect from time to time in the United States as set forth in pronouncements of the Financial Accounting Standards Board (and its predecessors) and the American Institute of Certified Public Accountants.

"*Governmental Body*" means any foreign or domestic federal, state or local government or quasi-governmental authority or any department, agency, subdivision, court or other tribunal of any of the foregoing.

"*Illegal Payments*" means payments to any officer or employee of any Governmental Body, or any employee, customer or supplier, or any unlawful contributions, payments, expenditures or gifts; in violation of applicable Law.

"*Indemnified Party*" means, collectively, the Buyer Indemnified Parties or Company Indemnified Parties, as applicable, indemnified by an Indemnifying Party under this Agreement.

"*Indemnifying Party*" means, collectively, the Company or the Buyer, as applicable, indemnifying an Indemnified Party under this Agreement.

"*Intellectual Property*" means all intellectual property rights of any type or nature, whether established by Law or contractual agreement, however, denominated, throughout the world, including trademarks, trade names, service marks, service names, mark registrations, logos,

assumed names, domain names, the goodwill in any of the foregoing; works of authorship, registered and unregistered copyrights, software, data, databases; technology, inventions, trade secrets, patents and patent applications, moral rights, rights of privacy and publicity, along with all rights to prosecute and perfect the same through administrative prosecution, registration, recordation, or other administrative proceeding, and all choses in action and rights to sue or seek other remedies arising from or relating to the foregoing.

"*Interim Balance Sheet Date*" is defined in <u>Section 4.4(a)</u>.

"*Inventory*" has the meaning set forth in <u>Section 4.22</u>.

"*Knowledge*" means, (a) in the case of the Company, the knowledge of any Company Founder, and (b) in the case of the Buyer, the knowledge of Greg Butterfield and Wendell Laidley, after reasonable inquiry of those representatives of the Buyer who are reasonably likely to have actual knowledge of the applicable subject matter.

"*Law*" means, with respect to any Person, any statute, law (including common law), code, treaty, ordinance, rule or regulation of any Governmental Body applicable to such Person.

"*Liability*" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

"*Licensed Software*" means all computer, software or firmware programs, modules or libraries licensed to the Company or any of its Affiliates and incorporated into or used by the Company or its Affiliates in, to develop, to maintain or to support any of the products or services of the Business.

"*Lien*" means any lien, mortgage, pledge, encumbrance, charge, security interest, adverse claim, liability, interest, charge, preference, priority, proxy, transfer restriction (other than restrictions under the securities laws), encroachment, Tax, Order, community property interest, equitable interest, option, warrant, right of first refusal, easement, profit, license, servitude, right of way, covenant or zoning restriction.

"*Lift*" means Lift Energy Construction, Inc. and is defined in <u>Section 3.3</u>.

"*Material Adverse Effect*" or "*Material Adverse Change*" means any event, change, development, or effect that, individually or in the aggregate, will or would reasonably be expected to have a materially adverse effect on (a) the business, operations, assets (including intangible assets), liabilities, prospects, operating results, value, employee, customer or supplier relations, or financial condition of an entity or any of its Subsidiaries, or (b) the ability of any of the Parties to consummate timely the transactions contemplated by this Agreement, other than, in each case, any changes, circumstances, events or conditions resulting, directly or indirectly, from: (i) changes in general economic conditions in any of the markets in which the Business operates; (ii) any change in economic conditions or the financial, banking, currency or capital markets in general; (iii) acts of God or other calamities, national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date of this Agreement, and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or

terrorist attack; (iv) changes in GAAP or interpretations thereof or other accounting principles or requirements; (v) any actions taken, failures to take action, or other changes or events relating to any of the Company to which Buyer has consented in writing; or (vi) the taking of any action contemplated by this Agreement or the Ancillary Agreements..

"*Material Contracts*" means all contracts, agreements, and commitments of Company, whether oral or written, and all Material Contracts.

"*Secretary's Certificate*" is defined in <u>Section 3.2</u>.

"*Objection*" is defined in <u>Section 6.6(b)</u>.

"*Officer's Certificate*" is defined in <u>Section 6.6(a)</u>.

"*Order*" means any order, award, decision, injunction, judgment, ruling, decree, charge, writ, subpoena or verdict entered, issued, made or rendered by any Governmental Body or arbitrator.

"*Ordinary Course of Business*" means the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency).

"*Organizational Documents*" means (a) any certificate or articles of incorporation, bylaws, certificate or articles of formation, operating agreement or partnership agreement, (b) any documents comparable to those described in clause (a) as may be applicable pursuant to any Law and (c) any amendment or modification to any of the foregoing.

"*Material Contracts*" means all Contracts of a Party which are material to the Company, and Material Contracts include, without limitation, all Contracts (a) related to Debt, (b) related to the acquisition of a business, (c) involving more than $10,000 (other than the purchase of inventory in the Ordinary Course of Business); (d) imposing a material restriction on competition or other business activities, and (e) any other Contract not entered into the Ordinary Course of Business and which is material to the Company.

"*Owned Software*" means all computer, software or firmware programs, modules or libraries owned or purported to be owned by the Company or any of its Affiliates.

"*Parties*" means the Parties to this Agreement.

"*Permit*" means any license, import license, export license, franchise, Consent, permit, certificate, certificate of occupancy or Order issued by any Person.

"*Permitted Lien*" means (i) any Lien for current Taxes that are not yet due or payable, (ii) any minor imperfection of title or similar Lien which individually or in the aggregate with other such Liens does not materially impair the value of the property subject to such Lien or the use of such property in the conduct of the Business, (iii) mechanics', materialmen's, landlords', workmen's, repairmen's, warehousemen's and carriers' Liens and other similar Liens that are incurred in the ordinary course of business, (iv) requirements incurred or other Liens relating to deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance, social security, and other similar statutory requirements, (v) Liens constituted by the terms of any Assigned Contract, (vii) Liens, deposits, or pledges to secure the performance of bids, tenders, Contracts (other than Contracts

for the payment of money), leases, public or statutory obligations, surety, stay, appeal, indemnity, performance or other similar bonds, or other similar obligations arising in the ordinary course of business and (viii) easements, rights-of-way, restrictions, and other similar Liens which, in the aggregate, do not materially interfere with the occupation, use, and enjoyment by the Buyer of the property or assets encumbered thereby in the normal course of business or materially impair the value of the property subject thereto.

"*Person*" means any individual, entity or Governmental Body.

"*Proceeding*" means any action, audit, lawsuit, litigation, investigation or arbitration (in each case, whether civil, criminal or administrative) pending by or before any Governmental Body or arbitrator.

"*Registered Intellectual Property*" shall mean patents, patent applications, registered copyrights, registered marks (including trademarks, service marks, and trade dress, to the extent registered), applications to register marks, registered domain names, and registered industrial designs that are material to the conduct of the Business as currently conducted.

"*Required Consents*" is defined in Section 4.1(e).

"*Restricted Area*" is defined in Section 7.7(a).

"*Restricted Cash*" is defined in Section 1.3(a)1.1(vi).

"*Restricted Funds*" is defined in Section 1.3(a)1.1(vi).

"*Restricted Period*" is defined in Section 7.7(a).

"*Retained Liabilities*" is defined in Section 1.3(a).

"*Seller*" is defined in the preamble.

"*Seller Group of Companies*" is defined in Section 3.3(b).

"*Separation Agreement*" shall have the meaning set forth in Section 7.7.

"*Shareholder*" is defined in the preamble.

"*Shares*" is defined in the Introduction.

"*Stock Restriction Agreement*" shall have the meaning set forth in Section 2.1(a).

"*Subsidiary*" means, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof or (b) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time

owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any manager, management board, managing director or general partner of such business entity (other than a corporation).  The term "*Subsidiary*" shall include all Subsidiaries of such Subsidiary.

"*Target Date*" shall have the meaning set forth in Section 3.1.

"*Tax Return*" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any Disclosure Schedule or attachment thereto, and including any amendment thereof.

"*Tax*" or "*Taxes*" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"*Third-Party Claim*" is defined in Section 6.5(a).

"*Threshold Amount*" shall have the meaning set forth in Section 6.4(a).

"*Total Purchase Price*" is defined in Section 2.1.

"*Transaction Expenses*" means the aggregate amount of all out-of-pocket fees and expenses incurred by or on behalf of, or paid or to be paid, by either the Buyer or Company in connection with the transaction contemplated by this Agreement or otherwise relating to the negotiation, preparation, or execution of this Agreement and any Ancillary Agreements or any other performance or consummation of any actions contemplated thereby.

"*Transfer Taxes*" means any Taxes that may be imposed on the assignment of the Assigned Assets.

"*White Oak*" is defined in Section 3.3(b).

"*Zenith Security*" means Zenith Security, LLC and is defined in Section 3.3.

"*Zenith Solar*" means Zenith Solar, LLC and is defined in Section 3.3.