# EXHIBIT E

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("**Agreement**") is made as of the 12th day of May, 2023 (the "**Effective Date**"), by and between Lumio HX, Inc., a Delaware corporation ("**Company**"), and Yumi Schade ("**Employee**").

## RECITALS

**A.**    Company and its Affiliates are in the business of providing solar and energy efficiency products and other homer services products to consumers nationwide.  For purposes of this Agreement, the term "**Affiliate**" means any entity currently existing or subsequently organized or formed that directly or indirectly controls, is controlled by or is under common control with Company, whether through the ownership of voting securities, by contract, or otherwise.

**B.**    It is the desire of Company to assure itself of the services of Employee by engaging Employee to perform services under the terms hereof.

**C.**    Employee desires to provide services to Company on the terms herein provided.

**D.**    The Parties previously entered into that certain Employment Agreement dated December 10, 2021 (the "**2021 Employment Agreement**"), and acknowledge their desire that this Agreement replace, extinguish, and supersede the 2021 Employment Agreement in all respects.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and of the respective covenants and agreements set forth below, the parties hereto agree as follows:

**1.**    **Employment**.  Company hereby employs Employee, and Employee agrees to be employed as Company's Senior Vice President of Strategic Operations.  Employee will report to the Company's Chief Administrative Officer ("**CAO**"), currently Steven King.  Employee's operations shall stem from the Company's offices in Lehi, Utah.  Employee shall devote her full time and attention to achieving the purposes of Company and discharging her responsibilities to Company.  Employee shall comply with all material rules, policies, and procedures of Company as are now in effect or that may be effective in the future.  Employee shall perform all of her responsibilities in compliance with all applicable laws.

**2.**    **At-Will Employment**.  Employee's employment with Company shall be at-will and shall be for no specific term, and either Employee or Company may terminate the employment relationship, with or without cause, subject to the provisions of <u>Section 5</u> below.

**3.**    **Compensation**.    For the duration of Employee's employment hereunder, Employee shall be entitled to compensation that shall be computed and paid pursuant to the following subparagraphs.

1

**3.1    Salary and Bonus**.

(a)    Effective as of the Effective Date, Employee shall be paid a salary at an annual gross rate of Two Hundred Fifty Thousand Dollars ($250,000) per year. The actual amount paid to Employee shall be prorated for the actual period of employment and payable in equal installments in accordance with Company's normal payroll practices, subject to appropriate deductions and withholding. The Company may, at its discretion, review Employee's salary from time to time to determine whether a change in salary shall be made; provided, however that the decision of whether to adjust salary is in the sole discretion of the Company. In addition to the annual salary set forth above, Employee shall be entitled to participate in any bonus programs adopted by the Company from time to time which are applicable to and include Employee and for which Employee qualifies.

(b)    Subject to meeting certain performance metrics which Company and Employee shall mutually determine within thirty (30) days following the Effective Date and compliance with the other terms and conditions of this Agreement, including, without limitation, Section 3.2 below, in addition to the amounts set forth in Section 3.1(a) above, Employee shall be paid a bonus of Five Hundred Fifty Thousand Dollars ($550,000.00) as follows: (i) such bonus will paid in four equal installments on a quarterly basis over the course of a one year period, and (ii) the first such payment of bonus shall commence on the last day of the second financial quarter of calendar year 2022, and continue for one year thereafter.

**3.2    Equity Vesting**. All shares ("**Shares**") of common stock ("**Common Stock**") held by Employee as of the Effective date shall vest in accordance with the terms of that certain Stock Restriction Agreement entered into by and between the Company and Employee (the "**Stock Restriction Agreement**"). In the event Employee shall receive additional shares of Common Stock after the Effective Date, such shares shall vest in accordance with any provisions set forth in the grant documents related thereto.

(a)    In the event that (i) Employee's continuous status as an employee of the Company is terminated by the Company without Cause (as defined below) within twelve (12) months of the closing (the "**Closing**") of that certain transaction contemplated by the Reorganization Agreement by and between the Company and Smart Energy Today, Inc dated as of the Effective Date (the "**Asset Purchase Agreement**") or (ii) Employee terminates his or her continuous status as an employee of the Company for Good Reason (as defined below) within twelve (12) months of the Closing, in either case other than as a result of death or Total Disability, 100% of the total number of Shares that are unvested shares pursuant to the Stock Restriction Agreement shall be automatically and immediately deemed vested shares, but provided that such acceleration of vesting shall be conditioned upon Employee executing and not revoking a release of claims in a form reasonably satisfactory to the Company.

(b)    In the event that (i) Employee's continuous status as an employee of the Company is terminated by the Company with Cause (as defined below), or (ii) Employee terminates his or her continuous status as an employee of the Company without Good Reason (as defined below) within twelve (12) months of the Closing, 100% of the total number of Shares

held by Employee, whether such shares be vested shares or unvested shares pursuant to the Stock Restriction Agreement, shall be automatically and immediately cancelled and forfeited by Employee. Additionally, and as provided in the Asset Purchase Agreement and the Stock Restriction Agreement, at any time, in the event Employee shall breach the provisions of (a) <u>Sections 4, 6.5, or 6.6</u> that certain Agreement Regarding Confidentiality, Non Competition, and Assignment of Inventions by and between the Company and Employee dated as of December 10, 2021 (the "**Confidentiality Agreement**") or (b) <u>Sections 7.7 or 7.</u>10 of the Asset Purchase Agreement, whether or not Employee shall be employed by the Company at the time of such breach, then, in such event, Employee expressly acknowledges and agrees that upon such breach 100% of the total number of Shares held by Employee, whether such shares be vested shares or unvested shares pursuant to the Stock Restriction Agreement, shall be automatically and immediately be deemed unvested shares and thereafter cancelled and forfeited by Employee.

3.3    **Equity Ownership**. All shares ("**Shares**") of common stock ("**Common Stock**") held by Employee as of the Effective Date or that are acquired in the future are subject to (a) the Amended and Restated Stockholders Agreement dated December 10, 2021 entered into by and between the Company and Employee (the "**Stockholders Agreement**"), (b) the terms of applicable equity award agreements and incentive plan documents, (c) any applicable Stock Restriction Agreement, and (d) the restrictions in Exhibit C hereto; provided that, to the extent that provisions in the agreements identified above address similar matters, the provisions affording the greatest protection to the Company shall govern, unless specifically provided to the contrary therein.

3.4    **Withholding**. Company shall be entitled to withhold from any amounts payable under this Agreement any federal, state, local and foreign withholding, and other taxes and charges that Company is required to withhold. Company shall be entitled to rely on an opinion of counsel if any questions as to the amount or requirement of withholding shall arise.

4.    **Other Benefits**.

4.1    **Certain Benefits**. Employee shall be eligible to participate in employee benefit plans established by Company on a basis commensurate with Employee's position and in accordance with Company's policies from time to time, provided that Employee meets all eligibility requirements of any such plan. Nothing herein shall require the adoption or maintenance of any such plan.

4.2    **Expenses**. Company shall reimburse Employee in accordance with Company's policies and procedures for reasonable business expenses necessarily incurred in the performance of duties hereunder provided that Employee provides appropriate receipts and vouchers and other reasonable documentation indicating the specific business purpose for each such expenditure in accordance with Company policies.

4.3    **Vacation**. Employee shall be entitled to vacation and other time off commensurate with then current Company policy.

**5.    Termination.**

  **5.1    General**.  Upon a termination for any reason and subject to Sections 5.2 and 5.3 below, the obligations of Company to pay or provide Employee with compensation and benefits under Sections 3.1 and 4.1 shall cease, and Company shall have no further obligations to provide compensation or benefits to Employee hereunder other than payment of compensation earned prior to the date of termination.

  **5.2    For Cause**.  Company shall have the right to immediately terminate Employee's employment with the Company and this Agreement for Cause upon providing Employee written notice of such termination.  "**Cause**" as used herein shall mean a good faith determination by the Board, in its sole discretion, that any of the following has occurred: (i) willful and repeated failure by Employee to perform his or her duties hereunder which is not remedied within ten (10) days after written notice from Company, (ii) Employee has engaged in unethical conduct or conduct constituting disloyalty to the Company, dishonesty, fraud, misappropriation, theft, embezzlement, or moral turpitude, whether or not involving the Company, or any other such actions which materially and negatively affect the reputation and goodwill of the Company; (iii) Employee has willfully or repeatedly failed to carry out the reasonable directions of the CSO, the Company's Chief Executive Officer, or the Company's board of directors ("**Board**") which is not remedied within ten (10) days after written notice from Company; (iv) Employee has engaged in conduct in violation of the material rules, policies, and procedures of Company or other misconduct or gross negligence in connection with the performance of his or her duties and such conduct has not been remedied within ten (10) days after written notice to Employee; (v) the Employee's conviction of, or plea of nolo contendere or confession to, any felony or other crime involving either fraud, breach of Employee's duty of loyalty with respect to Company, or other acts of moral turpitude; and (vi) Employee has materially breached the terms of (a) this Agreement, (b) Sections 4, 6.5, or 6.6 of the Confidentiality Agreement, (c) Sections 7.7 or 7.10 of the Asset Purchase Agreement, or (d) the Company's bylaws, and failed to cure said breach (if curable) within ten (10) days' written notice thereof by Company.    Notwithstanding the foregoing, any determination of Cause relative to Employee shall require the approval of the Board.  Upon termination of Employee's employment hereunder for Cause, all compensation described herein shall cease as of the termination date, and Employee shall have no rights to any other compensation or payments other than payment of compensation earned prior to the date of termination.

  **5.3    Without Cause or For Good Reason**.

   (a)    If Company terminates Employee's employment without Cause, or Employee resigns his employment with Good Reason (as defined below), subject to Section 5.3(b), Company shall (i) continue to pay Employee's base salary (at the annual rate then in effect), subject to applicable deductions and withholdings and in accordance with Company's normal payroll periods, for a period of six (6) months following the date of termination ("**Severance Period**"); (ii) pay any bonus that was earned but not yet paid prior to the date of termination and (iii) continue to provide health benefit coverage during the Severance Period (or

until Employee becomes eligible for comparable coverage under the medical health plans of a successor employer, if earlier) for Employee and any eligible dependents under all Company health and welfare plans in which Employee and any such dependents participated immediately prior to the date of termination to the extent permitted thereunder (and to the extent that such benefits may be provided under applicable law without penalty); provided, that, such coverage shall not be provided in the event Company would be subject to any excise tax under Section 4980D of the Code or other penalty or liability pursuant to the provisions of the Patient Protection and Affordable Care Act of 2010 (as amended from time to time), and in lieu of providing the coverage described above, Company shall instead pay to Employee a fully taxable monthly cash payment in an amount such that, after payment by Employee of all taxes on such payment, Employee retains an amount equal to the applicable premiums for such month, with such monthly payment being made on the first day of each month for the remainder of the Severance Period. For the avoidance of doubt, Employee's health benefit coverage from Company during the Severance Period shall run concurrent with the health continuation coverage period mandated by Section 4980B of the Code.

(b)    Notwithstanding the foregoing, (i) the amounts payable to Employee under Section 5.3(a) shall be contingent upon and subject to Employee's execution and non-revocation of a general waiver and release of claims agreement in the form attached hereto as Exhibit A (the "**Release**") and the expiration of any applicable revocation period (the date on which the Release becomes effective and non-revocable, the "**Release Effective Date**") occurring on or prior to the sixtieth (60th) calendar day following the date of termination; and (ii) the installment payments pursuant to Section 5.3(a) shall commence on the first payroll period following the Release Effective Date, and the initial installment shall include a lump-sum payment of all amounts accrued under Section 5.3(a) from the date of termination through the date of such initial payment; provided, however, that if the sixty (60) day period during which the Release Effective Date may occur spans two calendar years, then payment of the initial installment shall not be made until the first business day of the second calendar year (with such first installment to include a lump-sum payment of all amounts accrued under Section 5.3(a) from the date of termination through the date of such initial payment).

(c)    Employee shall not be required to mitigate the amount of any payment or benefit contemplated by this Section 5.3, nor shall any such payment or benefit be reduced by any earnings or benefits that Employee may receive from any other source. Except as provided in this Section 5.3, upon termination by Company without Cause, or upon resignation by Employee for Good Reason, Employee shall not be entitled to any further compensation, payments or severance.

(d)    "**Good Reason**" shall mean, without Employee's consent: (a) a material breach by Company of this Agreement; (b) a change by Company of Employee's reporting structure in the Company such that Employee is no longer reporting directly to the CSO; or (c) a substantial reduction in Employee's compensation; provided, however, that for the purposes of determining whether there has been a reduction of Employee's compensation, the following shall not be considered: (x) the award or failure to award any discretionary bonuses, (y) any

changes that are equally applicable to all eligible employees under Company benefit plans, and (z) any reductions in compensation made by Company ratably with other employees at similar levels of responsibility; provided, however, that none of the events described in the foregoing clauses shall constitute Good Reason unless Employee has notified Company in writing describing the events that constitute Good Reason within fifteen (15) calendar days following the first occurrence of such events and then only if Company fails to cure such events within fifteen (15) calendar days after Company's receipt of such written notice, and Employee shall have terminated Employee's employment with Company promptly following the expiration of such cure period. Any resignation by Employee that is not for Good Reason shall be deemed to be without Good Reason. Any termination by Company that is not for Cause, or due to death or Total Disability, shall be deemed to be without Cause.

      **5.4    Death or Total Disability.** This Agreement and Employee's employment hereunder shall terminate automatically upon the death or Total Disability of Employee. The term **"Total Disability"** as used herein shall mean Employee's inability (with or without such accommodation as may be required by law protecting persons with disabilities and that places no undue burden on Company) as determined in good faith by the Board, to perform his duties hereunder for a period or periods aggregating ninety (90) calendar days in any twelve (12) month period as a result of physical or mental illness, unless Employee is granted a leave of absence by the Board. If Employee's employment is terminated as a result of Employee's death or Total Disability, this Agreement shall terminate without any obligations of Company to Employee, other than for payment of compensation earned prior to the termination date.

      **5.5    Without Good Reason.** Employee may terminate his employment with Company without Good Reason upon ninety (90) days' advance written notice to Company. Upon a termination by Employee without Good Reason, Employee shall have no rights to any other compensation or payments other than payment of compensation earned prior to the date of termination.

      **5.6    Termination of All Positions**. Upon termination of Employee's employment for any reason, and regardless of whether Employee continues as a consultant to Company, Employee agrees to resign, as of the date of termination or such other date requested by Company, from all positions and offices that Employee then holds with Company and its subsidiaries and Affiliates. Employee agrees to promptly execute such documents as Company, in its sole discretion, shall reasonably deem necessary to effect such resignations, and in the event that Employee is unable or unwilling to execute any such document, Employee hereby grants his proxy to any officer of Company to so execute on his behalf.

      **6.    Return of Company Property.** Employee acknowledges that all memoranda, notes, documents, drawings, specifications, software, media and other materials containing any confidential or proprietary information of the Company or its Affiliates are the exclusive property of Company and/or its Affiliates, including any copies thereof, and Employee will deliver to Company all such material in Employee's possession or control upon Company's request and in any event upon the termination of Employee's employment with Company. Employee will also

6

return any keys, equipment, identification or credit cards, or other property belonging to Company or its Affiliates upon termination or request. Employee further agrees that if Company advances or loans Employee any money during the course of his employment, upon termination Employee shall immediately repay Company in full or alternatively execute a promissory note for the balance, providing for the remaining payment due within sixty (60) days of Employee's termination of employment with Company. Nothing in this provision shall preclude Company from requiring the execution of a promissory note at the time of any advance or loan, and Employee acknowledges that the terms of any such promissory note may require Employee to repay any outstanding amounts thereunder prior to Company's or an Affiliate's first filing of a registration statement on Form S-1 (or any similar form) with the Securities and Exchange Commission in connection with Company's or an Affiliate's initial public offering, which, for the avoidance of doubt, is not guaranteed to occur.

7.    **Disclosure**. Employee agrees fully and completely to reveal the terms of Exhibit B attached hereto to any future employer or potential employer of Employee and authorizes Company, at its election, to make such disclosure.

8.    **Representation of Employee**. Employee represents and warrants to Company that Employee is free to enter into this Agreement and that Employee has no commitment, arrangement or understanding to or with any party that restrains or is in conflict with Employee's performance of the covenants, services and duties provided for in this Agreement. Employee agrees to indemnify Company and to hold Company harmless against any and all liabilities or claims arising out of any unauthorized act or acts by Employee that, the foregoing representation and warranty to the contrary notwithstanding, violate or breach any such commitment, arrangement or understanding.

9.    **Conditions of Employment**. Company's obligations to Employee under this Agreement are conditioned upon Employee's execution and delivery of the Confidentiality Agreement, the form of which is attached hereto as Exhibit B the terms and provisions of which form a material part of this Agreement and which are hereby incorporated herein by this reference.

10.   **Assignability**. This Agreement shall constitute a legal, valid and binding obligation of Employee in accordance with its terms, and shall inure to the benefit of Company, its successors and assigns. During Employee's employment hereunder, this Agreement may not be assigned by either party without the written consent of the other; provided, however, that Company may in its sole discretion assign its rights and obligations under this Agreement, without Employee's consent to a successor by sale, merger or liquidation.

11.   **Notices**. Any notice required or permitted by this Agreement shall be in writing and delivered in person, sent by documented overnight delivery service, or mailed by certified or registered mail, postage prepaid, to the appropriate party or parties at the addresses referenced below, or to such other address as the parties may hereafter designate to the other in writing. Unless otherwise specified in this Agreement, all such notices and other written communications shall be effective (and considered received for the purposes of this Agreement) (a) if delivered,

7

upon delivery, (b) if sent by documented overnight delivery service, on the date delivered, or (c) if mailed, three (3) days after mailing. Notices shall be sent to Employee, at: 7024 50th Lane NW, Olympia, WA 98502 or if to Company, addressed to the attention of the Chief Executive Officer and separately the General Counsel, at the Company's current headquarters.

      **12.**    **Severability**. In the event that any provision of this Agreement or compliance by any of the parties with any provision of this Agreement shall constitute a violation of any law, or be deemed unenforceable or void, then such provision, to the extent only that it is in violation of law, or is deemed void or unenforceable, shall be deemed modified to the extent necessary so that it is no longer unenforceable, void or in violation of law and shall be enforced to the fullest extent permitted by law. If such modification is not possible, said provision, to the extent that it is in violation of law, void or unenforceable, shall be deemed severable from the remaining provisions of this Agreement, which provisions shall remain binding on the parties.

      **13.**    **Entire Agreement; Amendment**. This Agreement (including Exhibits A and B and C) contains the entire agreement of the parties, and supersede any prior or contemporaneous statements or understandings by or between the parties. Employee's rights, including his ownership of equity and equity like interests in Company, shall not be affected in any way by any of the provisions of this Agreement. This Agreement may be changed only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification, extension or discharge is sought, and any such modification on behalf of Company must be approved by the Board.

      **14.**    **Governing Law; Jurisdiction; Waiver of Jury Trial**. This Agreement shall be governed by and construed in accordance with the laws of the State of Utah excluding choice of law provisions. The parties hereby irrevocably and unconditionally agree to submit any legal action or proceeding relating to this Agreement to the non-exclusive general jurisdiction of the courts of the State of Utah located in Salt Lake County and the courts of the United States located in Utah and, in any such action or proceeding, consent to jurisdiction in such courts and waive any objection to the venue in any such court. The Parties agree that service of process upon each other in any such action or proceeding may be made by United States mail, certified or registered, return receipt requested, postage prepaid. Unless otherwise agreed, the prevailing party in any litigation relating to the interpretation or enforcement of this Agreement shall be entitled to reasonable costs and attorneys' fees. EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY SUIT, ACTION OR OTHER PROCEEDING INSTITUTED BY OR AGAINST SUCH PARTY IN RESPECT OF ITS RIGHTS OR OBLIGATIONS HEREUNDER.

      **15.**    **Third-Party Beneficiaries**. Affiliates of Company are and shall be third-party beneficiaries of this Agreement.

      **16.**    **Survival**. Sections 3.2, 5 through 9, 14, and 20 survive any termination of this Agreement or Employee's employment relationship with Company.

**17.    Nonwaiver**. Failure of Company to insist upon strict adherence to any provision of this Agreement or to enforce any provision, on one or more occasions, shall not be deemed to be a waiver of its right to enforce any provision in the future.

**18.    Counterparts**. This Agreement may be executed in counterparts (including by facsimile transmission or electronic image scan (PDF)), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**19.    Employee's Recognition of Agreement**. Employee acknowledges that Employee has read and understood this Agreement and agrees that its terms are necessary for the reasonable and proper protection of Company's business. Employee acknowledges that Employee has been advised by Company that Employee is entitled to have this Agreement reviewed by an attorney of Employee's selection, at Employee's expense, prior to signing, and that Employee has either done so or elected to forgo that right.

**20.    Section 409A of the Code**.

**20.1    General**. The parties hereto acknowledge and agree that, to the extent applicable, this Agreement shall be interpreted in accordance with, and incorporate the terms and conditions required by, Section 409A of the Code and the Department of Treasury Regulations and other interpretive guidance issued thereunder, including without limitation any such regulations or other guidance that may be issued after the Effective Date ("**Section 409A**"). Notwithstanding any provision of this Agreement to the contrary, in the event that Company determines that any amounts payable hereunder will be taxable currently to Employee under Section 409A(a)(1)(A) of the Code and related Department of Treasury guidance, Company and Employee shall cooperate in good faith to (i) adopt such amendments to this Agreement and appropriate policies and procedures, including amendments and policies with retroactive effect, that they mutually determine to be necessary or appropriate to preserve the intended tax treatment of the benefits provided by this Agreement, to preserve the economic benefits of this Agreement, and to avoid less-favorable accounting or tax consequences for Company, and/or (ii) take such other actions as mutually determined to be necessary or appropriate to exempt the amounts payable hereunder from Section 409A or to comply with the requirements of Section 409A and thereby avoid the application of penalty taxes thereunder; provided, however, that this Section 20.1 does not create an obligation on the part of Company to modify this Agreement and does not guarantee that the amounts payable hereunder will not be subject to interest or penalties under Section 409A, and in no event whatsoever shall Company or any of its Affiliates be liable for any additional tax, interest or penalties that may be imposed on Employee as a result of Section 409A or any damages for failing to comply with Section 409A.

**20.2    Special Rules**. Notwithstanding any provision to the contrary in this Agreement:  (i) no amount shall be payable pursuant to Section 5.3 unless the termination of the Employee's employment constitutes a "separation from service" within the meaning of Section 1.409A-1(h) of the Department of Treasury Regulations; (ii) if Employee is deemed at the time of his separation from service to be a "specified employee" for purposes of Section 409A(a)(2)(B)(i) of the Code, to the extent that delayed commencement of any portion

9

of the termination benefits to which Employee is entitled under this Agreement (after taking into account all exclusions applicable to such termination benefits under Section 409A), including, without limitation, any portion of the additional compensation awarded pursuant to Section 5.3, is required in order to avoid a prohibited distribution under Section 409A(a)(2)(B)(i) of the Code, such portion of Employee's termination benefits shall not be provided to Employee prior to the earlier of (A) the expiration of the six-month period measured from the date of Employee's "separation from service" with Company (as such term is defined in the Department of Treasury Regulations issued under Section 409A) and (B) the date of Employee's death; provided that upon the earlier of such dates, all payments deferred pursuant to this Section 20.2 shall be paid to Employee in a lump sum, and any remaining payments due under this Agreement shall be paid as otherwise provided herein; (iii) the determination of whether Employee is a "specified employee" for purposes of Section 409A(a)(2)(B)(i) of the Code as of the time of his separation from service shall be made by Company in accordance with the terms of Section 409A and applicable guidance thereunder (including, without limitation, Section 1.409A-1(i) of the Department of Treasury Regulations and any successor provision thereto); (iv) for purposes of Section 409A, Employee's right to receive installment payments pursuant to Section 5.3 shall be treated as a right to receive a series of separate and distinct payments; and (v) to the extent that any reimbursement of expenses or in-kind benefits constitutes "deferred compensation" under Section 409A, (A) such reimbursement or benefit shall be provided no later than December 31 of the year following the year in which the expense was incurred, (B) the amount of expenses reimbursed in one year shall not affect the amount eligible for reimbursement in any subsequent year, (C) the amount of any in-kind benefits provided in one year shall not affect the amount of in-kind benefits provided in any other year and (D) the right to any benefits or reimbursements or in-kind benefits may not be liquidated or exchanged for any other benefit. Neither Employee nor any of Employee's creditors or beneficiaries shall have the right to subject any "deferred compensation" under Section 409A payable under this Agreement to any anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, attachment or garnishment. Except as permitted under Section 409A, any "deferred compensation" under Section 409A payable to Employee or for Employee's benefit may not be reduced by, or offset against, any amount owing by Employee to Company or any of its affiliates.

*[Remainder Intentionally Left Blank; Signature Pages Follow]*

DocuSign Envelope ID: 6303B4F7-382D-45B0-A679-641D2CD285D3

**EMPLOYEE**

**COMPANY**

Lumio HX, Inc.

DocuSigned by:

Yumi Schade

936BB2367B7B4F8...

_____

Yumi Schade

_____

By:   Greg Butterfield

Its:   CEO

**Exhibit A**

**RELEASE OF CLAIMS**

FOR AND IN CONSIDERATION OF the severance and benefits to be provided to Employee in accordance with the employment agreement between Lumio HX, Inc. (the "**Company**") and Yumi Schade ("**Employee**") dated May 12, 2023 (the "**Employment Agreement**") which consideration is conditioned on Employee's signing this Release of Claims and to which Employee is not otherwise entitled, Employee, on his own behalf and on behalf of his heirs and estate, voluntarily, knowingly, and willingly release and forever discharge the Company, its subsidiaries, Affiliates, and parents, together with each of those entities' respective officers, directors, shareholders, employees, agents, fiduciaries, and administrators (collectively, the "**Releasees**") from any and all claims and rights of any nature whatsoever which Employee now has or in the future may have against them, whether known or unknown, suspected or unsuspected, for any act, omission, or event occurring up to and including the date of this Release of Claims.  This Release of Claims includes, but is not limited to, any rights or claims relating in any way to Employee's employment relationship with the Company (or any of the other Releasees) or the termination thereof or any rights or claims under any federal, state, or local statute, including, without limitation, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the Older Workers' Benefit Protection Act, the Fair Credit Reporting Act, the Rehabilitation Act of 1973 (including Section 504 thereof), the Civil Rights Act of 1866 (42 U.S.C. § 1981), Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Equal Pay Act, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Family Medical Leave Act, the Lilly Ledbetter Fair Pay Act, the Genetic Information Non-Discrimination Act, and the Employee Retirement Income Security Act of 1974.

This Release of Claims specifically includes, but is not limited to, any claim for constructive or wrongful discharge, retaliation, violation of public policy, libel, slander, defamation, or any other tort or contract claim.  This Release of Claims also includes any claim based upon the right to the payment of wages, incentive and performance compensation, bonuses, equity grants, carried interest points, vacation, stock benefits, or any other employee benefits, or any other rights arising under federal, state, or local laws prohibiting discrimination and/or harassment on the basis of race, color, age, religion, sexual orientation, religious creed, sex, national origin, ancestry, alienage, citizenship, nationality, mental or physical disability, denial of family and medical care leave, medical condition (including cancer and genetic characteristics), marital status, military status, gender identity, or discrimination and/or harassment on any other basis prohibited by law.  However, Employee acknowledge that Employee is not releasing any claim related to the enforcement of the terms of the Employment Agreement or this Release of Claims, any vested rights to benefits under Company employee benefits plans, any claim arising after the date on which Employee signs this Release of Claims, or any claim that is not otherwise waivable under applicable law.

Employee further represents that Employee has not filed against the Company or any of the other Releasees, any complaints, claims or lawsuits with any arbitral tribunal,

1

administrative agency, or court prior to the date hereof, and that Employee has not transferred to any other person any such complaints, claims, or lawsuits. Employee understands that by signing this Release of Claims, Employee waives his right to any monetary recovery in connection with a local, state, or federal governmental agency proceeding, and Employee waives his right to file a claim seeking monetary damages in any arbitral tribunal, administrative agency, or court. This Release of Claims does not (i) prohibit or restrict Employee from initiating communications directly with, responding to any inquiries from, providing testimony before, providing confidential information to, reporting possible violations of law or regulation to, or from filing a claim or assisting with an investigation directly with a self-regulatory authority or a government agency or entity, including the U.S. Equal Employment Opportunity Commission, the Department of Labor, the National Labor Relations Board, the Department of Justice, the Securities and Exchange Commission, Congress, and any Inspector General of any agency, or from making other disclosures that are protected under the whistleblower provisions of any federal, state, or local law or regulation; or (ii) require Employee to notify the Company of such communications or inquiry. Nothing herein, however, shall constitute a waiver of claims arising out of or relating to any acts or omissions occurring after Employee signs this Release of Claims, or claims for enforcement of this Release of Claims.

This Release of Claims does not constitute an admission of liability or wrongdoing of any kind by Employee or the Company. The provisions of this Release of Claims shall be binding upon Employee's heirs, executors, administrators, legal representatives and assigns. For the avoidance of doubt, each of the Releasees shall be a third-party beneficiary to this Release and shall be entitled to enforce this Release in accordance with its terms.

Employee further acknowledges that, in signing this Release of Claims, Employee has not relied on any promises or representations, express or implied, other than those that are set forth expressly in the Employment Agreement and this Release of Claims and that are intended to survive separation from employment, in accordance with the terms of the Employment Agreement.

Employee further acknowledges that:

1. Employee first received this Release of Claims on the date of the Employment Agreement to which it is attached as Exhibit A (i.e., the date set forth in the first sentence of this Release of Claims);

2. Employee understands that, in order for this Release of Claims to be effective, Employee may not sign it prior to the date of termination;

3. Employee has carefully read and understands this Release of Claims;

4. Employee was given twenty-one (21) days to consider his rights and obligations under the Employment Agreement and this Release of Claims and to consult with an attorney about both;

2

DocuSign Envelope ID: 6303B4F7-382D-45B0-A679-641D2CD285D3

5.  The Company advised Employee to consult with an attorney and/or any other advisor of Employee's choice before signing this Release of Claims;

6.  Employee understands that this Release of Claims is legally binding and that by signing it Employee gives up certain rights;

7.  Employee has voluntarily chosen to enter into this Release of Claims and has not been forced or pressured in any way to sign it;

8.  Employee acknowledges and agrees that the severance and benefits payable under the Employment Agreement are contingent on execution of this Release of Claims, which releases all of Employee's claims against the Company and the Releasees, and Employee knowingly and voluntarily agrees to release the Company and the Releasees from any and all claims Employee may have, known or unknown, in exchange for the benefits Employee has obtained by signing, and that these benefits are in addition to any benefit Employee would have otherwise received if Employee did not sign this Release of Claims;

9.  Employee has seven (7) days after Employee signs this Release of Claims to revoke it by notifying the Company in writing. The Release of Claims will not become effective or enforceable until the seven (7) day revocation period has expired;

10. This Release of Claims includes a waiver of all rights and claims Employee may have under the Age Discrimination in Employment Act of 1967 (29 U.S.C. § 621 et seq.); and

11. This Release of Claims does not waive any rights or claims that may arise after this Release of Claims becomes effective, which is eight (8) days after Employee signs it, provided that Employee does not exercise Employee's right to revoke it.

Intending to be legally bound, Employee has signed this Release of Claims as of the date written below.

Signature: _____     5/15/2023

                                                                                    _____

                                                                                    Date signed

3

## **Exhibit B**

Confidential Information, Invention Assignment, Non-solicitation,
and Non-competition Agreement


[*See Attached*]

**AGREEMENT REGARDING CONFIDENTIALITY,
NON-COMPETITION, AND ASSIGNMENT OF INVENTIONS**

This Agreement Regarding Confidentiality, Non-Competition, and Assignment of Inventions ("*Agreement*") is made and entered into as of this 10th day of December, 2021 (the "*Effective Date*") by and between Yumi Schade (referred to below in the first person) and Lumio HX, Inc., a Delaware corporation (the "*Company*"). For the consideration recited below, and in recognition that the goodwill, trade secrets and confidential information of Company, its clients and third parties require protection from unauthorized use and disclosure, I agree to the following terms and conditions:

1.    CONSIDERATION.    I recognize and acknowledge that I have received adequate and sufficient consideration in exchange for my signature on this agreement.  Consideration consists of one or more of the following: (a) my hire, salary increase, bonus, or promotion; (b) continued employment, where legally permissible; (c) access to the Company's Confidential Information (defined below); (d) the benefits of the Company's goodwill, including introductions to the Company's customers and business partners; (e) training in the Company's know-how and unique techniques and methods; and/or (f) the terms and conditions of and benefits received under this Agreement.

2.    CONFIDENTIALITY

2.1    Confidential Information.    I recognize that the Company now possesses or will possess information of a confidential or secret nature in both written and unwritten form which has unique commercial value in the business in which the Company is engaged (hereinafter referred to as "*Confidential Information*"). Confidential Information for this purpose includes but is not limited to trade secrets, processes, computer programs, methods, data, know-how, improvements, inventions, techniques, marketing plans, product plans, strategies, forecasts, and customer lists, whether developed by me or others and whether belonging to the Company or to any of its customers or suppliers. The term Confidential Information shall not mean: (a) any information that is known by me upon my employment, without an obligation of confidence; or (b) any information that is publicly disclosed by the Company. I understand that my employment with the Company creates a relationship of trust and confidence between me and the Company with respect to the Confidential Information that I may learn or develop as a result of my employment with the Company.

2.2    Ownership and Assignment.    I agree that all Confidential Information is the sole property of the Company and its assigns. I will promptly disclose all Confidential Information to the Company upon request, and I assign to the Company any rights which I may have or which I may acquire in any Confidential Information.

2.3    Obligation Not to Disclose.    At all times, both while I am employed with the Company and after the termination of my employment with the Company, I will keep in strict confidence all Confidential Information and I will not use or disclose any Confidential Information or anything relating to it in whole or in part, nor permit others to use or disclose it in any way, without the prior written consent of the Company, except as may be necessary in the ordinary course of performing my duties as an employee of the Company. I further agree to inform the Company immediately in writing in the event of any breach of this obligation of confidentiality.

2.4     Obligations upon Termination of Employment. Upon termination of my employment with the Company for any reason, I will promptly deliver to the Company all materials, documents, data, equipment, and other physical property of any nature containing or pertaining to any Confidential Information, and I will not take with me from the Company's premises any such material or equipment or any reproduction thereof.

2.5     Third Party Information. I recognize that the Company has received and will receive confidential or proprietary information from third parties. I will hold all such information in confidence and will not use the information or disclose it to anyone except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party.

3.     NOTICE OF IMMUNITY. I understand that I cannot be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Additionally, an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual: (a) files any document containing the trade secret under seal; and (b) does not disclose the trade secret, except pursuant to court order.

4.     COVENANT NOT TO COMPETE

4.1     Covenant. I agree that I will not directly or indirectly compete with the Company (as defined in Section 4.2 below) during the term of this Agreement from the Effective Date (as defined below) and for a period of one (1) year from the date my status as an employee is terminated in any geographic area in which the Company does business.

4.2     Direct and Indirect Competition. I agree that the phrase "directly or indirectly compete" shall include owning, managing, operating, or controlling, or participating in the ownership, management, operation, or control of, or being connected with or having any interest in, as a stockholder, director, officer, employee, agent, consultant, assistant, advisor, sole proprietor, partner, or otherwise, any business which is the same as or a direct market competitor of any business that is conducted by the Company or any of the Company's subsidiaries at the time my employment with the Company is terminated; *provided, however*, that this prohibition shall not apply to my ownership of less than one percent (1%) of the voting stock in companies whose stock is traded on a national securities exchange or in the over-the-counter market.

4.3     Enforceability. I acknowledge that the non-competition provisions are reasonable and necessary for the protection of the Company's business and proprietary information. I also acknowledge that the non-competition provisions are necessary to protect the goodwill of the Company. In addition, I acknowledge that the services rendered by me during my employment with the Company have been unique, special, and extraordinary. I also acknowledge that such provisions will not unduly restrict my ability to earn a livelihood. If any of the provisions of this Section 4 are held to be unenforceable, the remaining provisions shall nevertheless remain enforceable, and the court making such determination shall modify, among other things, the scope, duration, or geographic area of this Section to preserve the enforceability hereof to the maximum extent then permitted by law.

5.    <u>INVENTIONS</u>

5.1    <u>Disclosure of Inventions</u>.  If I conceive, learn, make, or first reduce to practice, either alone or jointly with others, any Employment Inventions (defined in Section 5.4 below) while I am employed by the Company, I will promptly disclose such Employment Inventions to the Company or to any person designated by it. All such Employment Inventions which the Company determines to be related to or useful in the Company's business or in the research and development of the Company's business shall be the sole and exclusive property of the Company.

5.2    <u>Assignment, Assistance, and Power of Attorney</u>.  The Company shall have the right to use and to apply for patents, copyrights, or other statutory or common law protections in any country for the Employment Inventions included in Section 5.1. I hereby assign to the Company any rights which I have acquired or which I may acquire in such Employment Inventions. Furthermore, I will assist the Company in every proper way at the Company's expense to obtain patents, copyrights, and other statutory or common law protections for such Employment Inventions in any country and to enforce such rights from time to time.  Specifically, I will execute all documents as the Company may use in applying for and in obtaining or enforcing such patents, copyrights, and other statutory or common law protections, together with any assignments thereof to the Company or to any person designated by the Company. My obligations under this Section shall continue beyond the termination of my employment with the Company, but the Company shall compensate me at a reasonable rate after such termination for the time which I actually spend at the Company's request in rendering such assistance. I hereby irrevocably and severally designate and appoint the Company and its duly authorized officers and agents as my agents and attorneys-in-fact to act in my stead to execute such documents and to do such other lawful and necessary acts to further the issuance or prosecution of such patents, copyrights, and other statutory or common law protections, and I hereby declare that such documents or such acts shall have the same legal force and effect as if such documents were executed by me or such acts were done by me.

5.3    <u>Exclusion of Prior Inventions</u>.  I have identified on *Exhibit A* attached hereto a complete list of all inventions which I have conceived, learned, made or first reduced to practice, either alone or jointly with others, prior to my employment with the Company and which I desire to exclude from the operation of this Agreement.  If no inventions are listed on this *Exhibit A*, I represent that I have made no such inventions at the time of signing this Agreement.

5.4    <u>Employment Inventions</u>.  The definition of Employment Invention as used in this Section 3 is the definition found in Section 2 of the Utah Employment Inventions Act (U.C.A. 34-39-2) as follows:

"Employment invention" means any invention or part thereof conceived, developed, reduced to practice, or created by an employee which is:

(a)    conceived, developed, reduced to practice, or created by the employee:

(i)    within the scope of his employment;

(ii)    on his employer's time; or

(iii)    with the aid, assistance, or use of any of his employer's property, equipment, facilities, supplies, resources, or intellectual property;

(b)     the result of any work, services, or duties performed by an employee for his employer;

(c)     related to the industry or trade of the employer; or

(d)     related to the current or demonstrably anticipated business, research, or development of the employer.

To the extent applicable, such "employment invention" shall be deemed a "work made for hire."

5.5     <u>License for Other Inventions</u>.  If, in the course of my employment with the Company, I incorporate into Company property an invention owned by me or in which I have an interest, the Company is granted a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license to make, modify, use and sell such invention as part of and in connection with the Company property.

6.      CONFLICTS

6.1     <u>Prior Agreements</u>.  I represent that, to the best of my knowledge, my performance of all the terms of this Agreement and my work as an employee of the Company does not breach any oral or written agreement which I have made to keep in confidence proprietary information acquired by me prior to my employment with the Company.

6.2     <u>Materials of Prior Employers</u>.  I represent that I have not used nor will I use in the performance of my duties for the Company any materials or documents of a former employer of mine which are not generally available to the public, unless I have first obtained written authorization from the former employer for their possession and use and have delivered a copy of such written authorization to the Company before my use of such materials or documents in connection with the performance of my duties for the Company.

6.3     <u>Other Agreements and Activities</u>.  While I am employed by the Company, I will not enter into any oral or written agreement which conflicts with my obligations under this Agreement or with the performance of my work as an employee of the Company.  I further agree to notify the Company in writing of any employment, consulting or similar service agreements between myself and any party other than the Company during my employment with the Company.

6.4     <u>Original Material</u>.  I warrant and represent that the materials and work product developed by me for the Company during my employment will be original and will not contain any material which has been copyrighted by a third party, considered a trade secret of a third party, or would violate or infringe on similar rights of any third party.

6.5     <u>Non-Solicitation Upon Termination of Employment</u>.  For one (1) year following the termination of my employment with the Company for any reason, I will not directly or indirectly solicit or attempt to solicit the business of any of the customers or clients of the Company who became known to me while I was employed by the Company either for myself or for any other person or entity, if such solicitation is competitive with the business of the Company.  Moreover, for one (1) year following the termination of my employment with the Company, I will not directly or indirectly solicit or attempt to solicit the services of any employees of the Company, either for myself or for any other entity, nor will I, directly or indirectly, hire any employees of the Company.

6.6    Non-Disparagement. I hereby agree not to make any disparaging statements, either written or verbal, to any third party, including any member of the media, regarding the Company, its services, practices, or employees; *provided* that the obligations of non-disparagement that are set forth in this Section 6.6 shall in no way: (1) limit my ability to make a claim to enforce my rights hereunder or (2) prevent me from truthfully responding to any subpoena, court order, or request from an administrative agency.

7.    MISCELLANEOUS

7.1    No Obligation to Employ. This Agreement does not constitute a contract of employment nor does it create an implied obligation of the Company to employ me for any certain period of time. I acknowledge that I am an at-will employee and that I can leave the Company at any time and the Company can terminate my employment at any time for any reason.

7.2    Injunctive Relief. I understand that disclosure of any Confidential Information or breach or threatened breach of any of the covenants or other agreements contained herein would give rise to irreparable injury to the Company, which injury would be inadequately compensable in money damages. Accordingly, the Company may seek and obtain injunctive relief from the breach or threatened breach of any provision, requirement, or covenant of this Agreement, in addition to and not in limitation of any other legal remedies that may be available.

7.3    Warranty of No Conflict or Violation. I warrant and represent that I have not entered into any agreements, written or oral, with any third party that would restrict or impair my ability to fulfill the duties under this Agreement and that I have taken no confidential or proprietary information or trade secrets from any third party and that I will not use any such confidential or proprietary information or trade secrets of any third party in the performance of my duties for the Company.

7.4    Successors and Assigns. This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns. Because I am providing personal services, I understand that I have no right to assign this Agreement; however, the Company shall have the right to assign this Agreement to any of the Company's successors, assigns, or affiliates or to any entity that, directly or indirectly, is in control of, is controlled by, or is under common control with the Company. If the Company assigns such rights or obligations, then I agree to privity of contract between myself and the assignee.

7.5    Survival. The provisions of this Agreement shall survive the termination of my employment and the assignment of this Agreement by the Company to any successor in interest or other assignee.

7.6    Severability. If any paragraph, sentence, term or provision of this Agreement or the application of this Agreement is found by a court of competent jurisdiction to be invalid or unenforceable, that determination shall not affect, impair or invalidate the remainder of this Agreement. Each paragraph, sentence, term and provision not directly designated to be invalid or unenforceable shall be valid and enforceable to the fullest extent permitted by law.

7.7    Entire Agreement. This Agreement constitutes the entire agreement between the Company and me with respect to the subject matters covered by it and supersedes all prior oral or written agreements between the Company and me relating to such matters.

7.8    <u>Modifications</u>.  This Agreement may not be modified or amended except by a written agreement that refers to this Agreement and is signed both by the Company and by me.

7.9    <u>Waiver of Breach</u>. The waiver of any breach of any provision of this Agreement or failure to enforce any provision hereof shall not operate or be construed as a waiver of any subsequent breach by any party.

7.10    <u>Governing Law; Jurisdiction</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Utah. With respect to any claim or action arising under this Agreement each party to the Agreement hereby (a) irrevocably submits to the exclusive jurisdiction of the Courts of the State of Utah, and (b) irrevocably waives any objection which such party may have at any time to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement brought in any such court, irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum and further irrevocably waives the right to object, with respect to such claim, suit, action or proceeding brought in any such court, that such court does not have jurisdiction over such party.

7.11    <u>Advice of Counsel</u>.  I acknowledge that, before executing this agreement, I have been given an opportunity to seek the advice of independent legal counsel, and I have read and understood all of the terms and provisions of this Agreement.

7.12    <u>Copies</u>.  Once signed, both parties agree that any reproduction of this Agreement made by reliable means (for example, photocopy or facsimile) shall be considered an original.

**I HAVE READ THIS AGREEMENT CAREFULLY AND UNDERSTAND ITS TERMS.  I HAVE LISTED ON EXHIBIT A TO THIS AGREEMENT ANY AND ALL PROPRIETARY INFORMATION, IDEAS, PROCESSES, INVENTIONS, TECHNOLOGY, WRITINGS, PROGRAMS, DESIGNS, FORMULAS, DISCOVERIES, PATENTS, COPYRIGHTS, OR TRADEMARKS, OR IMPROVEMENTS, RIGHTS, OR CLAIMS RELATING TO THE FOREGOING, THAT I DESIRE TO EXCLUDE FROM THIS AGREEMENT.**

*[Remainder Intentionally Left Blank; Signature Pages Follow]*

DocuSign Envelope ID: 6303B4F7-382D-45B0-A679-641D2CD285D3

IN WITNESS WHEREOF, the parties have caused this Agreement Regarding Confidentiality, Non-Competition, and Assignment of Inventions to be effective as of the Effective Date.

EMPLOYEE                                            Lumio HX, Inc.

*Yumi Schade*                                        *Greg Butterfield*
(Employee's Signature)                              (Signature of Authorized Representative)


Name:  Yumi Schade                                  Name: Greg Butterfield

**EXHIBIT A**

**PRIOR INTELLECTUAL PROPERTY**

**TO:**          _____

**FROM:**      _____

**DATE:**       _____

**SUBJECT:**    **Prior Intellectual Property**

**1.**      Except as listed in Section 2 of this Exhibit (below), the following is a complete list of all inventions or improvements relevant to the subject matter of my employment by Lumio HX, Inc.  (the "*Company*") that have been made or conceived or first reduced to practice by me alone or jointly with others prior to my engagement by the Company:

☐    No inventions or improvements.

☐    See below:

          _____

          _____

          _____

☐    Additional sheets attached.

**2.**      Due to a prior confidentiality agreement, I cannot complete the disclosure under Section 1 above with respect to Prior Intellectual Property generally listed below, the proprietary rights and duty of confidentiality with respect to which I owe to the following party(ies):

| Invention or Improvement | Party(ies) | Relationship |
|---|---|---|
| 1. _____ | _____ | _____ |
| 2. _____ | _____ | _____ |
| 3. _____ | _____ | _____ |

☐    N/A

☐    Additional sheets attached.

## Exhibit C

**Voting**. Until the earlier of (i) the second anniversary of effective date of this Agreement, or (ii) the date on which either of Travis Wilson or Greg Butterfield ceases to serve as a member of the Board of Directors of Lumio Holdings, Inc. ("**Parent**") or as an executive of the Company, at each annual or special meeting of Parent's stockholders (including any adjournments, postponements, or other delays thereof) or with respect to each action of the stockholders by written consent, Employee will vote, or cause to be voted, all shares of Common Stock of Parent owned by Employee, or over which Employee has voting control: (a) in favor of all directors nominated by the Board for election and (b) in accordance with the Board's recommendation with respect to any other Parent or stockholder proposal or nomination. Employee hereby appoints the Parent's Chairman of the Board with full power of substitution, as Employee's proxy to vote all such Common Stock in accordance with this section. In the event Parent refuses or fails to take any of the foregoing actions, the Parent is hereby granted a power of attorney to execute such documents and instruments as the Parent may reasonably determine necessary in order for Employee to satisfy the agreements contained in this section. The parties acknowledge that such proxy and power of attorney is coupled with an interest and is irrevocable. Should any provision of this section be found to be unenforceable, the parties must negotiate in good faith to develop and substitute a replacement provision having the effect that is as nearly as possible the same as the effect of this section as intended.

21546973_v1